ESTATE OF O. J. WARDWELL, DECEASED, RUTH A. INGERSOLL, ADMINISTRATRIX WITH WILL ANNEXED; AND ESTATE OF MARJORIE M. WARDWELL, DECEASED, RUTH A. INGERSOLL, EXECUTRIX, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 79892. Filed December 27, 1960.

*Maurice E. Stark, Esq.*, for the petitioners.
*Richard J. Shipley, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined a deficiency in the income tax of decedents, O. J. and Marjorie M. Wardwell, for the year 1956 in the amount of $661.34.

The question is whether a $7,500 payment by Marjorie M. Wardwell to Friendship Haven, Inc., was deductible as a charitable contribution under section 170(c) of the Internal Revenue Code of 1954.[1]

## FINDINGS OF FACT.

Some of the facts are stipulated and they are found accordingly.

Friendship Haven, Inc., is a charitable corporation, organized in 1946 not for pecuniary profit under the laws of Iowa. It operates the home known as Friendship Haven in Fort Dodgé, Iowa, by means of a body of trustees composed of the bishop and ministers and laymen of the North Iowa Annual Conference of the Methodist Church. The home is operated and maintained (pursuant to the stated corporate objective) "for aged and infirm ministers and members of The Methodist Church and any other aged persons of good moral character, who would be at home in a Christian environment."

The articles of incorporation provided, in part:

All property of whatsoever kind and nature shall be held by this corporation in its corporate name in trust, however, for the use of the Northwest Iowa Conference of The Methodist Church [2] and according to the usage and discipline of the Methodist Church, subject at all times to the rules of said discipline contained and in conformance with the purposes of this corporation as herein set out and according to the laws of the State of Iowa. This corporation shall be under the supervision of the Northwest Iowa Conference of the Methodist Church.

Friendship Haven consists of two buildings with five wings each. One wing is for service facilities, such as the dining room and hobbies and infirmary and the four other wings are for residents.

Applicants for admission to Friendship Haven must meet certain requirements, such as being at least 65 years of age, of good moral character, and free from communicable disease. Usually an applicant makes written application for admission but in any event applications are handled by an admissions committee composed of the executive director of Friendship Haven, Inc., who is a Methodist minister, and the business manager of Friendship Haven, Inc., and another trustee. Residents of Friendship Haven are provided with room,

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

[2] By amendment to the articles of incorporation this was changed to North Iowa Annual Conference, and is sometimes merely called the North Iowa Conference of the Methodist Church.

board, recreation, infirmary care, and religious services. The home gradually expanded over the years so that by 1960 it had about 315 residents, some of whom were physically or mentally ill part or all of the time. It operated 95 hospital beds and its staff consisted of 2 doctors and 55 nurses or aides.

Friendship Haven did not keep a waiting list of applicants but there was a file of applications for admission. The time between the admission application and the date of an applicant's admission varied, due to the limitations of facilities at the time, the time involved in making investigations, and the existence of an emergency situation such as an applicant being in dire need of such care as the home furnished.

Friendship Haven, Inc., conducted various fundraising activities, amongst them being the room-endowment plan. This consisted of soliciting individuals to make endowments of $5,000 to endow a room in the East Building and $7,500 to endow a room in the newer West Building. Such an endowment would not give the individual making it any property rights in any room and no right to life care, but plates suitably inscribed with the names of the endowers were placed on the doors of the resident rooms in the home. In the usual operation of the home such an endowment would entitle the endower or the person he designated to occupy the room, depending generally upon facilities available when application for residence was made. While there was no contract in the legal sense for such occupancy, the home held out to the prospective endowers that future occupancy would be granted, and it was granted.

Friendship Haven, Inc., does not enter into life-care contracts with individuals. The residents pay regular monthly charges. During the year in question residents who had made room endowments paid monthly charges of $95 per month and those who had not made room endowments (usually around 10 per cent of the membership) paid $125 per month, but all received substantially the same treatment. The maintenance cost of members was $95 a month. The sums paid by way of room endowments and $30 of the monthly sums paid by non-room endowers went into Friendship Haven's building fund. All members paid the same extra charges for infirmary care.

On July 16, 1951, the respondent issued a ruling letter to Friendship Haven, Inc., ruling it was exempt from Federal income tax as an organization operated exclusively for charitable purposes. It was also ruled that contributions to it would be deductible by the donors in accordance with the applicable statutes. This ruling has been in effect since the date of its issuance and was in effect during the calendar year 1956.

Decedent, Marjorie M. Wardwell, was a resident of Northwood, Iowa, for many years. Her husband, O. J. Wardwell, a prominent

attorney in Northwood, died in June of 1956. Marjorie M. Wardwell was a victim of Parkinson's disease which rendered her an invalid and she spent most of her time in bed. Her two sons were in the Air Corps and she was dependent upon hired help and the help of friends to care for her.

On July 8, 1956, a letter was sent to Tompkins, the executive director of Friendship Haven, by Marjorie M. Wardwell's minister, R. Roland Ritter, of the Northwood Methodist Church, describing the plight of Marjorie M. Wardwell, and stating she had asked him to inquire if it would be possible for her to be admitted to Friendship Haven. The letter asked Tompkins to come and see her and explain the requirements for admittance. In response to this letter, Tompkins came to see Marjorie M. Wardwell and he discussed the services offered and available at Friendship Haven. Marjorie M. Wardwell offered to transfer her home (sold in 1957 for $14,000) in return for life-care benefits but Tompkins explained this was not the policy of Friendship Haven, Inc.

On July 11, 1956, Marjorie M. Wardwell submitted an application for admission to Friendship Haven. The application listed her assets and debts showing a net worth of some $35,000 or $40,000 and the front page of the application reads:

Neither party is under any obligation until the application has been approved by the home and admission accepted by the applicant, and contract executed.

On July 19, 1956, Tompkins wrote a letter to Marjorie M. Wardwell stating, in part:

The Admissions Committee approved your application, subject to our working out satisfactory arrangements. They rather felt that for you to give a room and pay your monthly care would be fairer to you and your estate. The Board wants to be fair and render service for payment received.

Marjorie M. Wardwell was not then 65 years of age and she was almost a total invalid, thus necessitating some exception to the then-existing policy against admission of persons under 65 or invalids. Also there were problems of personnel and space to be worked out since one wing of Friendship Haven, Inc.'s second building was then under construction.

On August 13, 1956, Marjorie M. Wardwell executed a Membership Agreement with Friendship Haven, Inc., which obligated Friendship Haven, Inc., to provide an unfurnished room for her, together with light, heat, board, laundry, and also nursing and infirmary care. The agreement obligated her to pay $95 a month for her care in Friendship Haven, plus a charge of not to exceed $5 a day (later raised to $7) for infirmary care required for more than 5 days.

On the same date, August 13, 1956, Marjorie M. Wardwell executed

and signed a pledge to pay Friendship Haven, Inc., the sum of $7,500 as follows:

In consideration of the like promise of others, I promise to pay to FRIEND-SHIP HAVEN, INC. the sum of $7,500.00 (Seven Thousand Five Hundred Dollars) upon the following terms and conditions:

1. $750.00 (Seven Hundred Fifty and no/100 Dollars) will be paid on August 13, 1956, and the balance remaining will be paid on or before October 1, 1956.

2. It is my intention to give the full amount of this pledge to FRIENDSHIP HAVEN, INC. In the event of my death before it is fully paid I therefore agree that FRIENDSHIP HAVEN, Inc. shall have a valid claim against my estate for any unpaid balance then remaining.

Seven hundred fifty dollars was paid at the time of the execution of the above pledge, leaving a balance of $6,750.

At the time Marjorie M. Wardwell applied for admission to Friendship Haven, Inc., she desired to spend one more Christmas in her Northwood home and enter Friendship Haven in January of 1957.

Ruth A. Ingersoll, who had been O. J. Wardwell's secretary at the time he died and a friend of the Wardwells for more than 20 years, was appointed guardian of Marjorie M. Wardwell about September 14, 1956. During the process of her appointment she acted for Marjorie M. Wardwell under a power of attorney. While so acting, on September 4, 1956, she wrote a letter to Tompkins, as follows:

Mrs. Wardwell has asked me this morning to write you and inquire as to whether or not her room would be available by October 1, 1956, instead of January 1, 1956,[3] as she had previously planned.

If these arrangements are satisfactory with the home, I believe Mrs. Wardwell's son, Bill, would bring her furnishings for her room down to Ft. Dodge on Saturday, September 29, and then Mrs. Wardwell would come down on September 30th.

I would appreciate your writing her direct so that she will be assured of having her room by that time, and I will then make arrangements to complete the payment that still remains due Friendship Haven on this room for her.

I certainly wish to thank you for all your assistance in this matter and will await your early reply hereto.

Sincerely yours,                    /s/ Mrs. Ruth A. Ingersoll

On September 28, 1956, the remaining balance of $6,750 on the pledge was paid by Ruth A. Ingersoll as guardian and on September 29, 1956, Marjorie M. Wardwell was taken to Friendship Haven. Because of her physical condition she was taken directly to the infirmary but she expected to live in the room assigned to her. Ruth A. Ingersoll, as guardian, expended the amount of approximately $500 in furnishing the room but during her stay in Friendship Haven, Marjorie M. Wardwell spent all of her time in the infirmary with the exception of a few visits to the room in a wheelchair when she had a special nurse. Her

---

[3] Evidently a typographical error as it should have been 1957.

physical condition continued to fail and she died at Friendship Haven on March 31, 1959. During Marjorie M. Wardwell's residence at Friendship Haven, Ruth A. Ingersoll, as her guardian, paid the monthly charges for her care, which, because of the required infirmary care, totaled about $200 a month.

Ruth A. Ingersoll, as administratrix with will annexed of the estate of O. J. Wardwell and as guardian of Marjorie M. Wardwell, filed an income tax return with the district director of internal revenue at Des Moines, Iowa, reporting the 1956 joint income of her decedent and ward and taking thereon a deduction of the amount paid to Friendship Haven, Inc., in that year upon the pledge of $7,500 as reduced by the statutory limitation of section 170, or $3,223.81. Respondent disallowed the deduction and in his notice of deficiency he explained:

> The contribution to Friendship Haven, Inc., has been disallowed. Mrs. Wardwell paid the amount to Friendship Haven, Inc. on September 28, 1956 and took up residence at the institution September 29, 1956. The payment to Friendship Haven, Inc. entitled Mrs. Wardwell to preferred treatment as to the availability of a residence room and is now allowing her to live at the institution at a rate which is lower than charged persons not making a room endowment.

The above disallowance gives rise to the entire deficiency now in controversy.

### OPINION.

The issue is whether the $7,500 paid by Marjorie M. Wardwell in 1956 is a "charitable contribution" within the meaning of section 170. The term "charitable contribution" as used in the statute is defined in subsection (c) to mean "a contribution or gift to or for the use of" organizations that qualify by reason of organization and operation within the scope of stated purposes. Generally speaking, the organizations referred to are those which are so organized and operated as to fall within the category of tax-exempt organizations. The following quotation from respondent's brief shows the narrow issue to be decided here:

> Respondent contends the payment was not a charitable contribution because it was made in consideration of preferential treatment received or to be received or because of other anticipated benefits. Respondent has expressly limited the issue to whether the payment is deductible under the provisions of section 170 of the Internal Revenue Code of 1954. The tax-exempt status of Friendship Haven, Inc. has, for the purpose of this case, been stipulated and no issue with respect to section 503 is intended to be raised.
>
> Thus the issue is whether the payment is deductible as a charitable contribution under section 170. Ordinarily a taxpayer seeking to establish his right to a deduction for a charitable contribution must prove two things: (1) the payment, and (2) that it was paid to a qualified organization. For the purposes of this case, these points are admitted. The question here is whether the payment was a "contribution or gift".

Thus the $7,500 payment in this case to a qualified organization is a charitable contribution as that term is defined by the statute if it is a "contribution or gift to or for the use of" Friendship Haven, Inc. Respondent argues it was not because the payment was made in consideration of certain benefits received or anticipated by Marjorie M. Wardwell. Respondent points to the preference Marjorie M. Wardwell received by reason of her room endowment with respect to priority of admission and monthly care charges over individuals who made no room endowment. In brief, it is respondent's argument that the payment was made by Marjorie M. Wardwell for the *right* to occupy the room if and when she cared to exercise it, and, thereafter, receive the care and services for the payment of $95 a month, plus infirmary charges, and Friendship Haven, Inc., by reason of its receipt of such payment, recognized she would be entitled to such room occupancy and care at said rates. Respondent admits Marjorie M. Wardwell might not have received a legally enforcible right of such room occupancy but there was the expectation on the part of Majorie M. Wardwell that the endowment payment would secure for her the right of occupancy at said monthly rates and on the part of Friendship Haven, Inc., a recognition of such rights.

Petitioner argues on brief that "the evidence * * * supports the conclusion that Mrs. Wardwell made her room endowment payments to Friendship Haven in 1956 freely and voluntarily with nothing being offered to her by Friendship Haven and nothing received by her in the way of preferential treatment from Friendship Haven as a result of her making such endowment."

We are of the opinion that the only reasonable conclusion to be drawn from this record is that Marjorie M. Wardwell made the $7,500 payment in consideration of being granted admission into the home in the near future. Of course, it is possible she might have been admitted without the payment, but for all practical purposes, the payment insured her right to occupy the room. The evidence shows it was Friendship Haven's policy to admit around 10 per cent non-room endowers and 90 per cent room endowers. The following is from a brochure issued by Friendship Haven:

## BUILT FROM GIFTS ALONE

Friendship Haven has been built solely from gifts of more than 11,000 generous, thoughtful people who recognize and appreciate the problems of advancing age. To date these gifts total $1,675,000.00, about 40% of which has come in amounts of $5.00 to more than $1,000. This group of gifts is tremendously important and deeply appreciated. Without them Friendship Haven could not have been built—or even started.

Another group of gifts is made up of those large enough to endow one or more rooms. In such cases each gift is equal to the cost of building the room

and entitles the giver to occupy the room, or designate who shall occupy it. These *endowment gifts make up about 60% of the total.*

## LIVING COSTS PAID BY RESIDENTS

The cost of operating Friendship Haven in 1957 totalled $265,000. This was paid by our residents. Those who endow rooms pay $95.00 a month for maintenance. Those who do not endow rooms pay $125.00. The amount they pay, though modest indeed, is so efficiently administered that they receive all of the services mentioned and still there is enough left over to care for some 35 old age pensioners who can pay only part of their way.

Marjorie M. Wardwell, as a room endower, would pay $30 less per month than a non-room endower for her care and maintenance while in the home. It is true both room endowers and non-room endowers paid the same infirmary charges and Marjorie M. Wardwell stayed in the infirmary during her residence at Friendship Haven. But the fact is she received a right to lower monthly charges by her $7,500 payment even though she was never well enough to benefit from this right. The record shows she spent $500 to furnish the room assigned to her and when she entered Friendship Haven she expected to occupy the room.

It is an essential characteristic of a gift that the payment be without consideration. If the payment proceeds primarily from the incentive of anticipated benefit to the payor "of an economic nature" it is not a gift. Cf. *Commissioner* v. *Duberstein*, 363 U.S. 278. The facts and circumstances surrounding Marjorie M. Wardwell's payment, as well as the general testimony with regard to Friendship Haven's method of operation, show quite conclusively that the room endowment was made to secure room occupancy and both parties recognized it as such. And it was made for the additional benefit of lower monthly care charges than could have been secured if no endowment had been made. These were benefits of an economic nature. Respondent was right in disallowing the deduction.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

PIERCE, *J.*, dissenting: I am impelled to express my dissent from the Court's ultimate conclusion herein, under which it has denied any deduction for the purported gift of $7,500 which Marjorie Wardwell made to Friendship Haven, Inc.—a home for the aged and infirm, which concededly was organized and operated exclusively for charitable purposes, and with respect to which the Internal Revenue Service has ruled that contributions made to it are deductible by the donors.

The Court's conclusion is that said payment does not legally qualify as a "gift"; but that it was made "in consideration of [her] being granted admission into the home in the near future." I believe that such conclusion is inconsistent with, and not supported by, the Court's

own findings of fact; that it confounds "motive" with "consideration," and "expectations" with legal "rights"; that it fails to give effect to the intent of the controlling statute; and that it embodies tests for the recognition of charitable gifts which, if applied generally, will seriously handicap charitable organizations in their efforts to induce contributions for their essential needs.

1. It is well settled that, "Nothing is consideration * * * that is not regarded as such by both parties." 1 Williston, Contracts, sec. 100. p. 320 (rev. ed.); Cardozo, *J.*, in *McGovern* v. *City of New York*, 234 N.Y. 377, 388, 138 N.E. 26, 31. It also is settled that, "Motive is not the same thing with consideration"; "nor can any motive serve in itself as consideration." See 1 Williston, Contracts, sec. 111, p. 377, including footnote.

Here, the $7,500 pledge and payment *were not regarded by both parties*, or indeed by either of them, as legal "consideration" for any binding contract. As stated by the Court in its opinion, "Respondent admits Marjorie M. Wardwell might not have received a legally enforcible *right* of such room occupancy but there was the *expectation * * *.*" (Emphasis supplied.) The Court further found as facts: That "such an endowment [of a room] would not give the individual making it *any property rights* in any room and *no right to life care*"; that "there was *no contract in the legal sense* for such occupancy * * *"; and that "Friendship Haven, Inc., *does not enter into life contracts* with individuals." (Emphasis supplied.) Also, the Court stated in its opinion, "Of course, it is possible that she might have been admitted [to the home] without the payment * * *." All of this, in my view, definitely negatives any conclusion that the purported gift was made for any "consideration" (other than the stated consideration "of the like promise of others," which is a characteristic of most agreements to make a charitable contribution); and also negatives any conclusion that the "gift," in itself, gave her any legal "right" to anything.

What actually happened here was this. Marjorie Wardwell was a bedridden invalid, whose husband had recently died, whose sons were in the military service, and who was dependent on hired help and friends to care for her. In this situation, her minister communicated with Friendship Haven, described her plight, and inquired whether it might be possible for her to be admitted to the home. Her case was investigated in the usual manner by Friendship's executive director; and during the course of such investigation, an offer made by her to enter into a contract with the home for life care, was rejected with the explanation that Friendship did not enter into such contracts. Thereafter, she submitted an application in the usual form, for admission to the home; and after about 8 days, she was advised by letter that the admissions committee had approved her applica-

tion, subject to the home's working out satisfactory arrangements. (Regarding such arrangements, the Court found: "there were problems of personnel and space to be worked out since one wing of Friendship Haven, Inc.'s second building was then under construction.") Said letter of acceptance also contained the statement: "They [the admissions committee] *rather felt* that for you to *give a room* and pay your monthly care *would be fairer* to you and your estate." (Emphasis supplied.) This represented the solicitation of a gift; but it provides no warrant for a conclusion that the home, in approving the application for admission, acted other than altruistically.

About 3½ weeks after having been advised that her application for admission had been approved, Marjorie Wardwell executed the written pledge to make the "gift" of the $7,500 here involved. In this pledge, she declared it to be *her intention* that the amount thereof was *a gift* made "in consideration of the like promise of others"; and she agreed that, in the event of her death before payment, the same would become a valid claim against her estate. The pledge was absolute and unconditional; and the entire amount thereof was paid.

Undoubtedly, Marjorie Wardwell did "expect" that, pursuant to the action taken on her application for admission, she would enter the home; and she was aware that, under the home's established policy, she would there be given the same care which was provided for all other residents, and would be expected to pay therefor the same rates which the home, for reasons satisfactory to it, fixed uniformly for all other residents who had endowed rooms. These matters were not subject to any bargaining, but were determined by the home alone, as part of its own internal policy. As hereinbefore mentioned, her "expectations" created no legal "rights"; and they provided no "legal consideration" for her pledge and payment of the $7,500. In the absence of such "consideration," and in the absence of obtaining any legal "rights," her payment of the pledge qualified, in my judgment, as a charitable contribution.

2. I believe also, that there is no warrant for failing to give effect to an expressly declared gift to a charitable institution, made without legal "consideration," merely because the donor in making such gift may have been motivated by the realization that he was then receiving, or expected to receive, benefits from the charity's activities which his gift helped to support. No such restriction or limitation was expressed by Congress in its enactment of the statute which provides deductions for charitable contributions. The *Duberstein* case (363 U.S. 278), which is the only case cited by the Court in its opinion, did not involve any charitable contribution; nor did it involve the construction or application of the here controlling statute. And my search has failed to reveal any decided case in which such restrictive principle has been approved.

Moreover, I think that adoption of any such principle would disregard realities. Many charitable gifts, and particularly those made to local charities, yield benefits to the donor; and the existence of absolute purism in a donor's motive for making a charitable gift, is not commonly regarded to be material. For example, gifts to churches are often made because the donor and his family are receiving, or are expecting to receive, the benefits of the church or its Sunday school as a place for worship, baptism, and marriage—or he may even receive the privilege of occupying a designated pew. (The Internal Revenue Service has ruled that so-called pew rents qualify as charitable deductions. A.R.M. 2, 1 C. B. 150.) Gifts to a college for use in erecting a building, developing an athletic field, or founding a chair of learning, may be made with the understanding or expectation that the same will thereafter bear the name of the donor or that of a friend or relative designated by him—and thereby become a permanent monument. Also such college gifts are frequently solicited with the suggestion that the donor has a moral obligation to make reimbursement for the education received by him at less than its actual cost. And a gift made to facilitate the creation of a public park, may be made by the donor with the expectation that such park will improve and enhance the value of the surrounding property, including that owned by him.

Moreover, solicitation of charitable gifts are frequently accompanied by a statement that they will qualify for income tax deduction by the donor, and with the further suggestion that the income tax benefits may be increased, if property or securities which have appreciated in value are given in kind. In the recent case of *Maysteel Products, Inc.*, 33 T. C. 1021, this Court upheld for deduction under the statute, gifts to charities which had been made as part of a scheme of the donors to obtain tax benefits.

Congress made provision for the deduction for charitable gifts, in order to induce and encourage the making of such gifts. See S. Rept. No. 1567, 75th Cong., 3d Sess., reprinted in 1939–1 C. B. (Part 2) 779, 789. And this Court has held that, "Tax provisions as to charities are begotten from motives of public policy and are not to be narrowly construed." *Estate of J. B. Whitehead*, 3 T. C. 40, affd. 147 F. 2d 977; *Helvering* v. *Bliss*, 293 U.S. 144. I believe that in applying such provisions, the donor's motive for making the charitable gift is immaterial.

In my view, Marjorie Wardwell's payment of the $7,500 to Friendship Haven does qualify as a charitable gift. I would have allowed the claimed deduction therefor.

FORRESTER, *J.*, agrees with this dissent.

DRENNEN, *J.*, dissenting: I agree with the principles enunciated by Judge Pierce in his dissenting opinion. I do not believe the $7,500 contributed by Marjorie Wardwell was intended as anything other than a contribution. She agreed to pay $95 per month, plus infirmary charges, for the care and services furnished her by Friendship Haven. The majority opinion find as a fact that the maintenance cost of members was $95 per month and that sums paid by way of room endowments and $30 of the monthly sums paid by non-room endowers went into a building fund. The latter is a charitable purpose for which large sums of money are contributed each year without their deductibility being questioned—indeed it would probably be very difficult for charitable organizations to obtain sufficient funds for building purposes if such contributions were not deductible.

I do not think the fact that Marjorie Wardwell may have been given a preference as to room and admission should convert what seems to me to qualify as a charitable contribution under the definition thereof contained in section 170(c), I.R.C. 1954, into some other type of nondeductible expenditure. The statute does not mention "consideration," legal or otherwise. While I doubt the applicability of the *Duberstein* case (363 U.S. 278), which was concerned with whether a specific transfer to a taxpayer amounted to a gift so as to be excludible from the recipient's gross income as property acquired by gift, to a case involving the deductibility of charitable contributions, I do not think the $7,500 was contributed here primarily for an anticipated benefit to Marjorie Wardwell "of an economic nature" or for services to be rendered.

To hold, as does the majority here, that this endowment is not a deductible charitable contribution would defeat the purpose of Congress to encourage gifts and contributions to charitable organizations. See S. Rept. No. 1567, 75th Cong., 3d Sess. (1938), p. 14. I respectfully dissent.

FORRESTER, *J.*, agrees with this dissent.