301 F.2d 632
 ESTATE of O. J. WARDWELL, Deceased, Ruth A. Ingersoll, Administratrix with Will Annexed; and Estate of Marjorie M. Wardwell, Deceased, Ruth A. Ingersoll, Executrix, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 16799.
 United States Court of Appeals Eighth Circuit.
 April 5, 1962.
 
 Maurice E. Stark, Fort Dodge, Iowa and Robert D. Blue, Eagle Grove, Iowa, for petitioners.
 C. Guy Tadlock, Attorney, Department of Justice, Washington, D. C., John B. Jones, Jr., Acting Asst. Atty. Gen., Washington, D. C. and Lee A. Jackson, Alexander F. Prescott and John A. Bailey, Attorneys, Department of Justice, Washington, D. C., on the brief, for respondent.
 Before VOGEL, BLACKMUN and RIDGE, Circuit Judges.
 RIDGE, Circuit Judge.
 
 
 1
 In this case the Tax Court ruled that a subscription made and paid by a taxpayer as a "room endowment" to the building fund of a charitable institution admittedly having a tax-exempt status under Section 501(c) (3) of I.R.C.1954, 26 U.S.C.A. § 501(c) (3), was not a "gift" within the ambit of Section 170 (c) (2), I.R.C.1954, 26 U.S.C.A. § 170(c) (2), because it was made with a "motive" and "expectancy" by the donor "to secure room occupancy" and "benefits of an economic nature" from the charitable institution to which the subscription was made. As a consequence the Tax Court sustained the Commissioner's disallowance of any part thereof as a charitable deduction as claimed in an individual tax return made for that year, 1956.
 
 
 2
 The salient facts gleaned from the majority opinion[1] of the Tax Court (35 T. C. 443) are these: Shortly after the death of her husband, Marjorie M. Wardwell, made invalid by Parkinson's Disease, applied for admission in Friendship Haven, Inc., Fort Dodge, Iowa, a nonprofit, charitable corporation, organized in 1946 under the laws of the State of Iowa (hereinafter sometimes referred to as the "Home"). Friendship Haven, Inc. operates a home "for aged and infirm ministers and members of the Methodist Church, and any other persons of good moral character who would be at home in a Christian environment." The Home has two buildings with five wings each. One wing of each building is for service facilities, such as the diningroom, hobbies and infirmary; the other four wings are used for residence. Generally, applicants for admission must meet certain requirements, such as being sixty-five years of age, of good moral character, and free from communicable disease. Usually an applicant makes written application for admission to the Home. The Home does not keep a waiting list of applicants. The time between the date of the admission application and actual admission varies due to limitation of facilities, time involved in making application, and the existence of an emergency situation such as an applicant being in dire need of special care as the Home furnishes.
 
 
 3
 July 8, 1956, a letter was sent to Friendship Haven, Inc. on behalf of Mrs. Wardwell, inquiring if it would be possible for her to be admitted to the Home. The Executive Director of the Home called on her. She was then an invalid, confined to her bed; — her two sons were in the Air Corps — and she was dependent upon hired help and the help of friends to care for her. The Director of Friendship Haven, Inc. personally discussed with Mrs. Wardwell the services offered and available at the Home. Mrs. Wardwell offered to transfer her home (sold in 1957 for $14,000.00) in return for lifecare in the Home. That offer was rejected. It was then explained to her that "room endowments" were a feature of financing the building of the Home, but life-care contracts were not entered into by Friendship Haven, Inc.
 
 
 4
 On July 11, 1956, Mrs. Wardwell submitted an application in usual form for admission to the Home. July 19, 1956, she was informed that her application had been approved "subject to working out satisfactory arrangements." In the letter so informing her it was stated that "it was rather felt that for you to give a room and pay your monthly care would be fairer to you and your estate. The Board wants to be fair and render service for payment received." Mrs. Wardwell was not then sixty-five (65) years of age, and there were problems of personnel and space to be worked out before she could be admitted into the Home. One wing of Friendship Haven, Inc.'s West Building was then under construction.
 
 
 5
 Friendship Haven, Inc. conducted various fund-raising activities, amongst them being the room-endowment plan. This consisted of soliciting individuals to make endowments of $5,000.00 to endow a room in the East Building; and $7,500.00 to endow a room in the newer West Building. Such an endowment did not give the individual making it any property rights in Friendship Haven, Inc., nor in the room endowed. In the usual operation of the Home the endower or some person designated by him could have a name-plate placed on a room and could himself occupy, or designate someone else to occupy, that room, depending generally upon the facilities available when application for residence in the Home was made. It is conceded that such an endowment when made was to the Building Fund of the Home.
 
 
 6
 August 13, 1956, Mrs. Wardwell executed a Membership Agreement with Friendship Haven, Inc. by which the Home agreed to provide an unfurnished room for her, together with light, heat, board, laundry, and also nursing and infirmary care for which she was to pay $95.00 a month, plus an extra fixed charge for infirmary care. On the same date, she executed a subscription pledge to Friendship Haven, Inc. as follows:
 
 
 7
 "FRIENDSHIP HAVEN, INC.
 
 
 8
 Fort Dodge, Iowa.
 
 
 9
 August 13, 1956.

 Northwood Iowa
 Town State
 
 
 10
 "In consideration of the like promise of others, I promise to pay FRIENDSHIP HAVEN, INC., the sum of $7,500.00 (Seven Thousand Five Hundred Dollars) upon the following terms and conditions:
 
 
 11
 "1. $750.00 (Seven Hundred Fifty and no/100 Dollars) will be paid on or before August 13, 1956, and the balance remaining will be paid on or before October 1, 1956.
 
 
 12
 "2. It is my intention to give the full amount of this pledge to FRIENDSHIP HAVEN, INC. In the event of my death before it is fully paid I therefore agree that FRIENDSHIP HAVEN, INC., shall have a valid claim against my estate for any unpaid balance then remaining.
 
 
 13
 "Marjorie M. Wardwell
 Signature"
 
 
 14
 Payments were made on that pledge by Mrs. Wardwell or her Guardian as recited therein.
 
 
 15
 When Mrs. Wardwell applied for admission to Friendship Haven, Inc., she expressed the desire to spend one more Christmas in her home and enter Friendship Haven, Inc. in January of 1957. However, on September 4, 1956, her Guardian wrote a letter to the Home, inquiring "whether or not her room would be available by October 1, 1956, instead of January 1, 1957 as previously planned." She entered the Home on September 29, 1956. On September 28, 1956, the day before she entered the Home, the remaining balance of $6,750.00 due October 1, 1956 by the terms of the pledge, was paid by her Guardian. Because of her physical condition at that time, Mrs. Wardwell was taken directly to the infirmary where she stayed until her death on March 31, 1959, with the exception of a few visits to the room she endowed, made in a wheel chair when she had a special nurse. Because she required infirmary care, Mrs. Wardwell paid Friendship Haven, Inc. $200.00 each month during her stay in the Home.
 
 
 16
 A federal income tax return for the year 1956 was timely filed for Mrs. Wardwell with the District Director of Internal Revenue at Des Moines, Iowa, reporting therein her income for the entire year 1956, and her husband's income from January 1, 1956 to and including the date of his death on June 11, 1956. Among other deductions claimed in that return was a charitable deduction in the amount of $3,223.81 made to Friendship Haven, Inc. as a consequence of the $7,500.00 pledge paid as above, as reduced by statutory limitation of Section 170(b) (1), supra.
 
 
 17
 On February 6, 1959, the District Director, I.R.S., Des Moines, Iowa, sent a deficiency notice to petitioner[2] in which it was stated, among other things:
 
 
 18
 "The contribution to Friendship Haven, Inc. has been disallowed. Mrs. Wardwell paid the amount to Friendship Haven, Inc. on September 28, 1956, and took up residence at the institution September 29, 1956. The payment to Friendship Haven, Inc., entitled Mrs. Wardwell to preferred treatment as to the availability of a residence room and is now allowing her to live in this institution at a rate which is lower than persons not making a room endowment." (Emphasis added.)
 
 
 19
 A majority of the Tax Court sustained the Commissioner's disallowance. Tersely stated, they did so on the theory that the $7,500.00 payment made by Mrs. Wardwell to the Home was not a "gift", but was made by her with the "motive" and "expectation" of being granted admission into the Home; that both parties to the endowment agreement "recognized it as such"; so that "for all practical purposes the payment insured her right to occupy the room" she had endowed, and further, that "it was made for the additional benefit of a lower monthly charge" to be paid by Mrs. Wardwell than she would have paid "if no endowment had been made" by her. Otherwise stated, the Tax Court ruled it was a quid pro quo arrangement. A more detailed statement of facts than as above recited is contained in the several opinions of the Tax Court, supra. The basic facts are not in dispute. We shall advert to some of them in the course of this opinion.
 
 
 20
 To bring the disallowance of the charitable deduction claimed in this case into proper focus it should be pointed out that the premise therefor appears to be that the Commissioner and majority of the Tax Court considered and found that the time of payment of the contribution or gift in question was a determinative factor. We note that fact because in the deficiency notice it was stated: "Mrs. Wardwell paid the amount — on September 28, 1956, and took up residence in the institution September 29, 1956. The payment" of the contribution to the Home "entitled Mrs. Wardwell to preferred treatment as to availability of a residence room and — allow(ed) her to live at this institution at a reduced rate which (was) lower than persons not making a room endowment." In the majority opinion of the Tax Court the conclusion reached in affirmance of such disallowance was stated thus: Mrs. Wardwell made the "$7500 payment in consideration of being granted admission to the home in the near future. * * * And it was made for the additional benefit of lower monthly charges than (she) could have — secured if no endowment had been made." Therefore, in the light of the foregoing, it strikes us that the inquiry to be made in this appeal is not so much what the "motive" or "expectation" of Mrs. Wardwell was when the payment was made but, rather, what was her "intention" at the time the contribution or gift in question was actually made to the Home and whether the facts surrounding the then making thereof exist in fact as claimed in the deficiency notice and found by a majority of the Tax Court. Motive and expectation do not destroy the reality and genuineness of a bona fide transaction. (Cf.) Maysteel Products, Inc. v. C. I. R., 287 F.2d 429 (7 Cir. 1961.) Nor is a contribution or gift, absolute in form when made, invalidated by reason of conditions arising subsequent to the making thereof. Fargason v. C. I. R., 21 B.T.A. 1032 (1930).
 
 
 21
 The undisputed facts in the record before us reveal that on July 11, 1956, Mrs. Wardwell submitted an application in usual form for admission to the Home. July 19, 1956, she was informed that her application had been approved. On August 13, 1956, Mrs. Wardwell executed a "Membership Agreement" with the Home. On the same date, she executed a subscription whereby she pledged $7500.00 as a "room endowment" to the Home. By that subscription, Mrs. Wardwell specifically stated it was her "intention to give the full amount of (that) pledge" to the Home and it if was not paid in full before her death she agreed that it was to be "a valid claim against (her) estate." By the terms of that subscription it was to be paid in two installments: "$750 on or before August 13, 1956" and "the balance remaining" to "be paid on or before October 1, 1956." That subscription was made in favor of an admittedly charitable institution. Under the law of Iowa, as elsewhere, a "subscription" made to charity "in consideration of like promises of others" is a binding legal obligation on the part of the donor, from the date of its execution. Cf. McDonald v. Gray, 11 Iowa 508 (1861); Cottage Hospital v. Merrill, 92 Iowa 649, 61 N.W. 490 (1894); Brokaw v. McElroy, 162 Iowa 288, 143 N.W. 1087, 50 L.R.A.,N.S., 835 (1913); Young Men's Christian Ass'n v. Caward, 213 Iowa 408, 239 N.W. 41 (1931); 50 Am.Jur., p. 783, § 10. Hence, it appears as a question of law that when Mrs. Wardwell executed the subscription pledge she thereby assumed a personal legal obligation and imposed one upon her estate, regardless of any relationship, negotiation, motive, or expectation that she might then have had in mind as to her admission into Friendship Haven, Inc. Factually, it is undisputed in the record that when Mrs. Wardwell made the subscription pledge she stated that she did not then desire to immediately enter the Home but expected to do so on January 7, 1957. Therefore, it indubitably appears that when the subscription pledge in question was executed Mrs. Wardwell, factually and legally, presumptively had knowledge that she had obligated herself to pay her subscription pledge in the taxable year 1956, prior to the year in which she then contemplated or had any desire to enter the Home.
 
 
 22
 It was after Mrs. Wardwell executed the subscription pledge and had made the first payment thereon that request was made for her earlier admittance to the Home. The evidence is that Mrs. Wardwell's invalid condition worsened and that she became more urgently in need of care as charitably provided by the Home. When that circumstance arose, the final payment on Mrs. Wardwell's subscription pledge was due to be made on October 1, 1956. Seemingly, it is the fact that such payment was made on Mrs. Wardwell's subscription pledge the day before she was admitted to the Home, that the Commissioner and Tax Court majority were led to the conclusion that such payment was the inducing cause for Mrs. Wardwell being granted admission to the Home. The Tax Court majority said: "The facts and circumstances surrounding Marjorie M. Wardwell's payment, as well as the general testimony with regard to Friendship Haven's method of operation, show quite conclusively that the room endowment was made to secure room occupancy and both parties recognized it as such." (35 T.C. 443.)
 
 
 23
 There is no evidence in the record before us establishing the fact that both parties ever recognized the pledge or any "payment" made thereon by Mrs. Wardwell as being for the purpose "to secure room occupancy" for her. All the evidence and any reasonable inference to be adduced therefrom are contra. Mrs. Wardwell at all times in question was hopelessly invalid. It must have been obvious to all that if she was ever admitted to the Home she would have to be taken to the infirmary and cared for therein in accordance with rules and regulations as promulgated by the Home. That is exactly what happened! She never did occupy the room she endowed.[3] Respondent admitted before the Tax Court that Mrs. Wardwell did not have a "legally enforcible right of room occupancy" by the Membership Agreement which she executed. That is the legal effect of that unambiguous document which controlled her "care and maintenance" in the Home. Therefore, it appears without dispute that except for her age Mrs. Wardwell entered the Home under the same rules and regulations promulgated and established for admission of all residents to the Home and recipients of its charitable purpose. As noted above, it was the practice of the Home to waive compliance with its rules and regulations and to admit those especially in need of care as provided by it.
 
 
 24
 Notwithstanding, it is respondent's contention, and the Tax Court majority found, that the "room endowment" permitted Mrs. Wardwell "the additional benefit of lower monthly care charges than could have been secured if no endowment had been made." The facts as found by the Tax Court majority do not warrant any such conclusion. Their finding was that all residents of the Home who could afford to pay were charged the same amount for "care and maintenance" i. e. $95.00 per month, plus an extra charge for infirmary care. They found that the only difference between the charge paid by "room-endowers" and "non-room-endowers" is that the latter paid $30.00 a month additional. As to that latter sum, their finding was that it "went into Friendship Haven, Inc.'s building fund." It was also found that Mrs. Wardwell's "pledge was absolute and unconditional; and the entire amount thereof was paid" into the "building fund of the Home." The evidence further revealed that those residents of the Home who could not financially make any payment to the building fund were cared for and maintained therein for $95.00 a month or less. Under such state of facts, we cannot ascertain any factual premise for the conclusion of the Tax Court majority that Mrs. Wardwell, as a room-endower, entered the Home in "expectation" of "preferred treatment," and with a "motive" of securing the benefit of a lower monthly charge for her "care and maintenance" than that which could have been secured if no room-endowment had been made by her. The fact is, and the finding of the Tax Court majority was, that she paid $200.00 per month for her "care and maintenance" in the infirmary, from the time of her admission to the date of her death.
 
 
 25
 Under the facts above stated, to hold that the room endowment payment made by Mrs. Wardwell, was from "motive" and "expectation" of a beneficial nature, is to "confound `motive' with (legal) `consideration' and `expectation' with `legal rights' — and — embodies tests for the recognition of charitable gifts" which is "not supported by the Court's own findings of fact." (Dissenting op., Pierce, J., supra, 35 T.C. p. 450.) That observation by Judge Pierce is consonant with what is said in Philpot v. Gruninger, 81 U.S. 570, 577, 20 L.Ed. 743 (1871):
 
 
 26
 "It is, however, not to be doubted that there is a clear distinction sometimes between the motive that may induce to entering into a contract and the consideration for the contract. Nothing is consideration that is not regarded as such by both parties. It is the price voluntarily paid for a promisor's undertaking. An expectation of results often leads to the formation of a contract, but neither the expectation nor the result is the cause or meritorious recompense in fact or in law."
 
 
 27
 Motivation and personal expectation do not destroy the reality and genuineness of a given transaction, even in tax cases. Cf. Gallun v. C. I. R., 297 F.2d 455 (7 Cir. 1961.) Certainly that is so "where all the facts and circumstances in (a) case, including the express stipulations of the parties, clearly show the making and the intent to make a (contribution or) gift," to a charitable institution. Contributions or gifts to charities "cannot be converted into a payment for services by inaccurately describing" them. Bogardus v. Commissioner, 302 U.S. 34, 44, 58 S.Ct. 61, 66, 82 L.Ed. 32.
 
 
 28
 It is obvious that the denial of the charitable deduction claimed in this case was adjudged by a majority of the Tax Court by ignoring unambiguous documents which clearly and manifestly revealed the "intention" of Mrs. Wardwell when she made her subscription pledge to Friendship Haven, Inc. The legal effect of an unambiguous written agreement always presents a question of law. Ray v. C. I. R., 283 F.2d 337 (5 Cir. 1960). Whether a trier of fact ignores the legal effect of a transaction presents a mixed question of law and fact subject to review by this Court. Bogardus v. C. I. R., supra, 302 U.S. l.c. 44, 58 S.Ct. l.c. 66. Only by ignoring the subscription pledge and the Membership agreement, both equally unambiguous, can it be inferred that there was a "motive" and "expectation" on the part of Mrs. Wardwell contrary to the expressed "intention" contained in those documents. To infer that payment of the subscription pledge was the inducing cause for Mrs. Wardwell's admission to the Home is clearly erroneous as a matter of law when uncontroverted, legally binding, written evidence established otherwise. Where a contribution to charity is made by way of a legally binding "subscription pledge" and payments are made pursuant thereto in a given taxable year, such payments constitute "charitable contributions" as defined in Section 170, I.R.C.1954. Cf. Nehring v. C. I. R., 131 F.2d 790 (Cir. 7, 1943); Sullivan v. C. I. R., 16 T.C. 228 (1951).
 
 
 29
 The decision of the Tax Court is reversed.
 
 
 
 Notes:
 
 
 [1]
 There were two dissenting opinions, one by Pierce, J., the other by Drennen, J., with Forrester, J., concurring in both opinions
 
 
 [2]
 Ruth A. Ingersoll was Administratrix with Will Annexed of the Estate of O. J. Wardwell, and Guardian of Marjorie M. Wardwell, and in her representative capacities filed the 1956 income tax return here considered. She accordingly brings this action for redetermination of the tax in question, in her representative capacities
 
 
 [3]
 It might be inferred that she had "hope" that sometime in the future she might be able to live in the endowed room, but the probabilities always present provided no foundation therefor. It is common knowledge that Parkinson's Disease presently is incurable and in its final form gradually produces bodily deterioration to complete helplessness. Apparently that was the status of Mrs. Wardwell's physical condition when she entered the Home