Herbert L. SEDAM and Ruth I. Sedam, Plaintiffs-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

No. 74-1744.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 28, 1975.

Decided June 23, 1975.

Scott P. Crampton, Asst. Atty. Gen., Dennis M. Donohue, Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., Stanley B. Miller, U. S. Atty., Indianapolis, Ind., for defendant-appellant.

Karl J. Stipher, Richard E. Aikman, Indianapolis, Ind., for plaintiffs-appellees.

Before FAIRCHILD, Chief Judge, SWYGERT and TONE, Circuit Judges.

TONE, Circuit Judge.

The government appeals from a judgment of the District Court holding that a taxpayer was entitled to charitable deductions on his federal income tax returns under section 170 of the Internal Revenue Code (26 U.S.C. § 170) for payments made to a retirement home in connection with placing his mother in the home for her lifetime. We reverse that judgment.

Plaintiff Herbert L. Sedam, whom we shall call the taxpayer (his wife is a party only because she signed the returns),

sought in 1963 to have his mother admitted to the Methodist Home for the Aged, a non-profit charitable corporation, in Franklin, Indiana. Since its constitution and by-laws required applicants who were financially able to pay for their care for the rest of their lives to do so, the home followed the practice of conducting an investigation of the financial status of both the applicant and the applicant's children. When the investigation revealed the financial ability to make a payment, the applicant would not be admitted unless he or his family made the prescribed payment. During the period 1963 through 1966, between 80 and 85 percent of the 200 or more people at the home had made admission payments.

At the time the taxpayer's mother was admitted to the home, the amount of the payment was determined in accordance with a plan, called the founder's gift plan, which was related to the home's construction of an addition and other improvements in 1963. A brochure describing the plan, addressed to prospective applicants, states as follows:

"There is only one way in which these additional facilities can be provided and that is by the first occupants paying for the construction of the units in which they will live.

.    .    .    .    .

"Here's how the Founder's Gift plan works:

"Choose the type of unit in which you wish to live.

"Choose the location of the unit you wish.

"Make the required deposit, so that construction may be started and completed at an early date.

"Pay the balance within one year."

The person who was superintendent of the home at the times pertinent here testified, "I think it was very clear that if they wanted to come into the home and were able to make a contribution, we—they had to do it."

In addition to the admission payment, applicants were required to pay for their care while in the home. The brochure describes these payments as follows:

"When you enter the Home you will pay for your life care. You may do this by making a deposit, based on life expectancy tables, of sufficient amount to guarantee your care for as long as you live. Or you may make monthly payments. The current monthly rate is $150.00 per person and this figures [sic] increases to $200.00 if one becomes chronically ill."

The brochure also contains floor plans of the various types of units available to applicants and shows the price range for each type.

There is no dispute that the taxpayer, a physician, was financially able to pay for his mother's admission to the home. He discussed his mother's admission with the superintendent of the home and he and his mother selected the unit she was to occupy. He undertook to pay $12,000 for that unit, $3,000 down and the balance in three equal annual installments. The following notation appears in the records of the home relating to the application of the taxpayer's mother:

"Her son Dr. Herbert L. Sedam is buying the Apartment E–131 for $11,-500.00. Sent check for $3,000.00. Wants to send $3,000 each year for next three years. (see letter) Guarantees expense for mother. Has $15,-000 life insurance on his life with mother as beneficiary."

On August 30, 1963, the taxpayer transmitted his check in the amount of $3,000 to the home with a transmittal letter stating as follows:

"Enclosed herewith is check for $3,000.00 as a contribution or gift to the Home, to be used in any manner you see fit.

"I will send you $3,000.00 annually for the next 3 years. Total $12,-000.00."

The minutes of the home's admission committee meeting of September 12, 1963, state as follows:

"MRS. EMMA SEDAM, Indianapolis. Ralph Hastings moved acceptance for E–131 at $11,500 with the superintendent getting safeguards on her room money. Seconded by W. R. Lynch and carried."

The superintendent of the home advised the taxpayer of this action in a letter stating in pertinent part as follows:

"The Admissions Committee, which met last Thursday, approved the admittance of your mother to the Methodist Home. They accepted your recommendation of paying $3,000 a year for the next three years on the room. They had certain recommendations for me to pass on to you and when you come down to make out the contract, I will explain them to you."

The same day an application on a stock form was signed, as accepted, on behalf of the home and on November 5, 1963, the application was signed by the taxpayer's mother. This document states in pertinent part as follows:

"1. FACILITIES

"Applicant desires to occupy the following type of facility in said Home:

E – 131 — $11,500.00

"2. PRELIMINARY PAYMENT

"Contemporaneous with the execution of this application, applicant has paid (or will pay on or about _____) to the Home the sum of $_____ as a preliminary Founder's Gift or Sustaining Gift payment for such proposed facility. [The blanks in this paragraph and paragraph 3 were not filled in.]

"3. SUPPLEMENTAL PAYMENTS

"Applicant will pay to the Home an additional sum of $_____, representing payment in full of Founder's Gift or Sustaining Gift for said facility above described, when said payment is requested by the Superintendent of the Home, said request, however, to be made not earlier than the following date(s): _____

_____

_____

. . . . .

"5. TERMINATION PRIOR TO ADMISSION

"When the facilities hereinabove described are ready for occupancy, or at any time prior thereto, applicant may terminate this application by giving written notice to the Home of such intention so to terminate the same. In the event of such termination during the first year of this contract, the Home shall forthwith refund to applicant 90% of the amount of the preliminary and supplemental payments; 75% during the second year; 60% during the third year; 45% during the fourth year; 30% during the fifth year and after the fifth year no refund will be made."

The application also provided for monthly payments for "lifetime care." Once the home accepted the application, it was obligated to admit the applicant. During a probationary period of three months, either the home or the applicant could terminate the latter's residency, in which event the refund provisions quoted above were applicable.

When the taxpayer's mother entered the home she at first occupied a room in the older part of the building, and when the construction of the addition was completed, she moved into the room in the addition that she and taxpayer had selected. She occupied that room until the last few months of her life, which she spent in the infirmary and a hospital.

The $12,000 amount originally agreed upon for the room was changed, the record does not show why, to $11,500. The taxpayer paid, in addition to the down payment of $3,000, three more installments, $3,000 in 1964, another $3,000 in 1965, and $2,500 in 1966. He claimed all of the payments as charitable deductions on his federal income tax returns. Apparently the deductions for the first two years were not questioned, but deficiencies were assessed for the deductions on the 1965 and 1966 returns. The taxpayer paid the deficiencies, totaling $4,727.67 in principal amount, and sued in the District Court to recover the part

of that amount paid because of the disallowance of the charitable deductions.

The District Court held that the payments to the home which are in issue were made "without consideration" and therefore were deductible charitable contributions. We disagree.

■ Section 170 allows as a deduction "any charitable contribution," which is defined as "a contribution or gift" for any charitable use described in that section. The government argues that to qualify as a contribution or gift under section 170, a payment must be made out of a "detached and disinterested generosity," which is the standard in determining whether a payment received is a gift not includible in gross income under section 102 of the Code (*Commissioner v. Duberstein*, 363 U.S. 278, 285, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), quoting from *Commissioner v. LoBue*, 351 U.S. 243, 246, 76 S.Ct. 800, 100 L.Ed. 1142 (1956)). The disagreement among courts as to whether the disinterested generosity test should be applied under section 170 is summarized in *Singer Co. v. United States*, 196 Ct.Cl. 90, 449 F.2d 413, 421–422 (1971). We need not enter that dispute in order to decide this case. It is at least clear that a payment is not a contribution or gift under section 170 if it is made with the expectation of receiving a commensurate benefit in return, as we find to be true here. *Cf. Singer Co. v. United States, supra*, 449 F.2d at 422–423.

■ The taxpayer's mother was required to make "founder's gift plan" payments as a condition to admission to the home, since she or her son was financially able to do so. She would not have been admitted to the home unless such a payment was made. The taxpayer does not argue that he was unaware of the home's requirements. He acknowledged that he agreed to pay the third and fourth installments which are in issue here. The inference is inescapable from the documents summarized above that he did so in consideration of the home's admitting his mother as a resident. We need not decide whether the taxpayer or his mother, or both of them, were legally obligated to make the payments, although we think his mother was by virtue of the written contract formed by the executed and accepted application, and that he probably was by reason of a unilateral contract. It was sufficient that he promised to make the payments to induce the home to admit his mother, and made them pursuant to that promise and so his mother could continue to reside there. The taxpayer's intention governs, not his characterization of the payments as "contributions" or "gifts." *Cf. Bogardus v. Commissioner*, 302 U.S. 34, 43, 58 S.Ct. 61, 82 L.Ed. 32 (1937).

The taxpayer relies upon *Estate of Wardwell v. Commissioner*, 301 F.2d 632 (8th Cir. 1962), and the government argues at length that *Wardwell* was wrongly decided. We need not reach the government's contention, for the case is easily distinguishable. There the court viewed the evidence as showing that the pledge and payment by Mrs. Wardwell were not "for the purpose 'to secure room occupancy,' for her," and that payment of the pledge was not "the inducing cause for Mrs. Wardwell's admission to the Home." (301 F.2d at 637, 638.) In the case at bar the evidence clearly shows that the pledge and the payments pursuant thereto were made to secure room occupancy and were the inducing cause for the taxpayer's mother's admission to the home.

Reversed.