United States Court of Appeals,

Fifth Circuit.

No. 95-60576.

ESTATE of Louise S. MONROE, Deceased, Robert J. Monroe, Provisional Administrator and Estate of J. Edgar Monroe, Executor, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Oct. 9, 1997.

Appeal from the Decision of the United States Tax Court.

Before KING, JONES and DUHÉ, Circuit Judges.

EDITH H. JONES, Circuit Judge:

I. *BACKGROUND*

This case requires interpretation of § 2518(b) of the Internal Revenue Code and its accompanying regulations, which describe "qualified disclaimer" of benefits, a device commonly used for "post-mortem" estate and other tax planning. The disclaimants here were 29 legatees of the wife's will, all of whom were asked by her husband and did irrevocably disclaim the proffered bequests. Shortly afterward, the husband gave them gifts equaling or exceeding the bequests, and not long after that he died at age 93. The Tax Court concluded that the disclaimers were induced or coerced by "the implied promise that [the disclaimants] would be better off it they did what Monroe wanted them to do ...," even though he made no explicit promises. Finding that the "coerced/induced" standard is inconsistent with the regulations and a fair reading of the statute, we reverse on nearly all of the

1

disclaimers.

On April 28, 1989, Louise S. Monroe died at the age of 91, leaving a multimillion dollar estate. J. Edgar Monroe (Monroe), her husband, became executor of the estate. Monroe, who was then 92 years old, sought help from Robert Monroe, his nephew, in administering the estate. An estate tax return was timely filed in March 1990. Edgar Monroe died in May 1990.

The Monroes had no children, but Louise Monroe's will made 31 specific cash bequests to extended family members, long-time employees, and friends, as well as 4 bequests to corporate entities. Louise Monroe also made bequests in trust to two grandnieces and a grandnephew, giving each a treasury bond with a $500,000 face value. Monroe was the residual beneficiary of his wife's estate.

The will called for each bequest to bear its portion of the death taxes. Touche Ross, the accounting firm retained by the estate, also determined that generation-skipping transfer taxes would have to be borne by some of the individual legatees. The tax impact on the legatees under these circumstances would be substantial, amounting in some cases to 75%-80% of the individual bequests. However, projections showed that tax liability was significantly reduced if legatees disclaimed their legacies. Deeply concerned about the high tax burden on the individual bequests, Monroe and Robert Monroe decided to pursue disclaimers as a means of reducing the overall federal tax liability. Before requesting the disclaimers, Monroe received assurance from Touche

2

Ross that he could independently make gifts to the legatees and include bequests to them in his own will. The accountants also advised Robert Monroe that a disclaimer was only valid if it was done without the promise of anything in return.

With assistance from the accountants, Monroe and Robert Monroe identified 29 legatees to approach about renouncing. Robert Monroe rehearsed with one of the accountants his presentation to the legatees. In substance, Robert Monroe made the following points: his uncle was upset about the amount of taxes that would have to be paid by the estate and the legatees; each bequest would be significantly reduced by taxes; his uncle would like each legatee to disclaim his or her bequest; each legatee who disclaimed would be giving up a right; and any disclaimer had to be voluntary and without consideration.

Monroe personally asked Kathleen Gooden Hayward, Monroe's grandniece and one of the legatees of a $500,000 treasury bond, as well as four household employees to give up their bequests. Robert Monroe made some version of his presentation to the remaining 24 legatees on the list. In December 1989, each of the 29 legatees signed a disclaimer, conceded by the Commissioner to be valid and effective under Louisiana law. The total amount disclaimed was $892,781, and this amount was included in the marital deduction on the estate tax return as money which passed to Monroe.

In late December 1989 and January 1990, Monroe wrote each of the disclaimants a personal check in an amount approximately equal to the gross amount of the bequest renounced. Each check bore the

3

notation "gift." Inadvertently, Monroe failed to file a 1989 gift tax return for the December 1989 gifts. However, in 1991, a timely gift tax return was filed covering all the gifts made in January 1990, and an amended gift tax return was filed for the 1989 taxable year.

After an audit, the Commissioner disallowed the marital deduction claimed in the estate tax return, reducing it by the amount of the 29 disclaimers and by the generation-skipping transfer taxes associated with the three in-trust bequests. The Commissioner determined that the disclaimers were invalid and that the generation-skipping transfer taxes should be charged to the estate residual and not to the particular bequests. The Commissioner also applied a fraud penalty.

On the estate's petition for redetermination, the Tax Court, although noting that each disclaimer was motivated by different factors, analyzed the disclaimers as a group, citing only a few examples. The Tax Court summarized the motivation for the disclaimants' actions as follows:

> Some of the disclaimants were told by the nephew that Monroe had always taken care of them and had never cheated them or that Monroe was a generous man. Many of the disclaimants anticipated that Monroe would continue to care for them financially or was likely to make a bequest to them in his will. Some disclaimants believed that executing the disclaimer would be in their best long-term interest, because they did not wish to upset Monroe by refusing to renounce.

The Tax Court agreed with the Commissioner on 28 of 29 disclaimers and, although it denied a fraud penalty, on the imposition of a negligence penalty. The Tax Court concluded that the disclaimers were not "qualified disclaimers" under I.R.C. §

4

2518(b).  The resulting deficiency was $625,552.73, plus a negligence penalty of $125,104.55.  The taxpayer appealed.

## II. *THE TAX COURT DECISION*

When a legatee, other than a surviving spouse, makes a qualified disclaimer that causes the surviving spouse to be entitled to the property, the disclaimed interest is treated as if it passed directly to the surviving spouse.  *See* Estate Tax Regs. § 20.2056(d)-1(b).  An estate may take a marital deduction for property passing directly from the decedent to a surviving spouse.  *See* I.R.C. § 2056(a).  Thus, the estate's marital deduction depends on whether the 29 disclaimers at issue are qualified disclaimers; the generation-skipping tax imposed on three of the bequests does not apply if qualified disclaimers were made.

Section 2518(b) provides that "the term "qualified disclaimer' means an irrevocable and unqualified refusal by a person to accept an interest in property but only if ... (3) such person has not accepted the interest or any of its benefits...."[1]

In concluding that all but one of the disclaimers were not qualified within the meaning of § 2518, the Tax Court reasoned that the disclaimants

---

[1]A "qualified disclaimer" must also be in writing, must be received by the transferor within 9 months of the transfer or when the disclaimant reaches age 21, and must result in the interest passing to a person other than the disclaimant without any direction by the disclaimant.  *See* I.R.C. § 2518(b).  None of these requirements is contested by the Commissioner.

In addition, although § 2518 is a gift tax section, § 2046 makes it apply to disclaimers of legacies and inheritances as well.

expected, for one reason or another, that they would receive their renounced bequests in the form of a gift or legacy from Monroe. Furthermore, the testimony of many of the disclaimants suggests that they feared what would happen if they refused to renounce their bequests.

...

The disclaimants may not have explicitly negotiated with or bargained with Monroe or the nephew for consideration in return for executing their disclaimers. Each of the disclaimants other than Helene Tebo, however, was induced or, in some instances, coerced, into executing a disclaimer. Under these circumstances, the consideration for their disclaimers was the implied promise that they would be better off if they did what Monroe wanted them to do than if they refused to do so. Their disclaimers thus were not "unqualified" as required by section 2518.

The Tax Court analyzed the 29 disclaimers as a group, citing excerpts of trial testimony from three disclaimants as "representative of that of a majority of the disclaimants." First, the Tax Court cited the testimony of Lawrence Lee, who had served as a butler and chauffeur to the Monroes since 1949. Lee renounced a specific bequest of $50,000 as well as a bequest in the amount of his annual salary, or $10,000. Approximately three weeks later, he received a check from Monroe for $60,000 bearing the notation "gift." Lee testified in part:

Q. What did he [J. Edgar Monroe] ask you?

A. He asked us to renounce, give it—turn it over to him.

Q. Did he say why?

A. No, I don't think. I can't remember exactly for what reason, other than to turn it over to him, and he would take care of it.

Q. He would take care of you if you turned it over to him.

A. Yes.

The Tax Court also relied on the testimony of Betsy

Richardson, a niece of the Monroes. Before Louise Monroe's death, Richardson's daughter, Lisa, had been sick with cancer, and Monroe had paid $10,000 toward Lisa's treatment as well as $10,000 upon her high school graduation. At trial, Richardson testified why she renounced a $5,000 bequest from Louise Monroe:

Q. Why did you ultimately decide to sign the act of renunciation?

A. Because, like I said, I didn't know if I would need help for her [Lisa] later, and you just—you don't go against Edgar if you ever want anything from him.

The Tax Court also cited testimony from Kathleen Hayward, Monroe's grand niece. Hayward disclaimed her right to income from the $500,000 bond bequeathed to her in trust. Hayward's children also executed disclaimers of their rights to the principal upon her death. With a market value of $535,781, this legacy represented more than half of the total amount disclaimed. Testifying that she thought of the Monroes as her parents, Hayward described a long, consistent pattern of the Monroes' generosity toward her. After Hayward's first marriage ended, Louise Monroe bought a house for Hayward and provided an allowance that allowed Hayward to stay at home with her three children. The Monroes also provided a trust fund that paid for the education of Hayward's children.

After Louise Monroe died, Robert Monroe approached Hayward about the renunciation. She also talked with Monroe about renouncing. By the time of her aunt's death, Hayward was better off than her sister and brother, who were also beneficiaries of bequests in trust of $500,000 bonds. Hayward was, accordingly, better able to handle the loss of her legacy. Hayward talked over

7

the idea with her husband and with an attorney, who cautioned her that she was giving up a right. After stating that she received nothing in exchange for her disclaimer, was not promised anything by Robert or Edgar Monroe, and had no agreement that Edgar Monroe would do anything for her later, Hayward gave the testimony seized upon by the Tax Court:

Q. Isn't it true that you told the agents that you knew from the conversation with J. Edgar Monroe that you would get the inheritance money, if not shortly after renouncing the bequest, then in his will?

A. He didn't state that. I sort of certainly assumed that.[2]

---

[2]Although the Tax Court's excerpt stopped there, Hayward went on to testify on redirect:

Q. I would just want to make it clear, Kathy. Did your uncle say anything to you when he was asking you to renounce that led you to believe that he was going to make a gift to you within two weeks after this event?

A. No. No, certainly not.

       * * *

Q. What did you—do you recall what you told Ms. West [attorney for the Commissioner] then regarding whether you would get something from Edgar in the future, your Uncle Edgar?

A. My assumption was that he would probably leave it to me in his will.

Q. But nothing was said to—

A. No.

Q. Why did you assume that?

A. Because he knew that Auntie—that was a request from Auntie, that she wanted me to have that money, and I felt that he would honor that request in his will; that at this point he needed the cash, but he didn't have it, and he would at some point in his will—that was my thought, that in his will I would be remembered.

8

The Tax Court next highlighted testimony from Robert Monroe. He stated that he had not bargained with the disclaimants and had not made any promises that Edgar Monroe would make payments to the legatees in return for the disclaimers. On cross-examination, he was asked why he mentioned his uncle's generosity as a part of his presentation to the legatees:

Q. What has generosity got to do with disclaiming on the part of a person being disclaimed in favor of it?

A. It puts into perspective the fact that someone is asking you to do something and he's not promising you anything. He's not giving you anything, but at least you're identifying what type of person he is or was, anyway.

Focusing upon this testimony, the Tax Court concluded that Robert Monroe

> intended to buttress the legatees' confidence in Monroe's continued generosity....
>
> The nephew's testimony demonstrates that he intended to inform the disclaimants that the probability that they would receive something from Monroe in the future was good. Conversely, if the legatees refused to disclaim, they were unlikely to receive anything from Monroe subsequently, because their refusal would be against Monroe's wishes.

Thus, the Tax court concluded that the disclaimers were not "unqualified" within the meaning of § 2518, and that the subsequent payments by Monroe were not "merely part of a pattern of generosity" but were in return for the execution of the disclaimers.

---

Q. Would it have made any difference to you if you would have not received the money?

A. No. I am in a position now that I really don't need it. I may have—well, I can't say totally no. I may have not been real happy. I probably would have been hurt. My feelings would have been very hurt, but I am lucky. I am very lucky.

9

## III. *THE PARTIES' CONTENTIONS*

On appeal, the estate contends that the Tax Court confused the two tests for acceptance of a disclaimed interest within the meaning of § 2518(b)(3). The estate relies on the Treasury Regulations interpreting § 2518(b)(3):

> A qualified disclaimer cannot be made with respect to an interest in property if the disclaimant has accepted the interest or any of its benefits, expressly or impliedly, prior to the disclaimer. Acceptance is manifested by an affirmative act which is consistent with ownership of the interest in property.... In addition, the acceptance of any consideration in return for making the disclaimer is an acceptance of the benefits of the entire interest disclaimed.

Gift Tax Regs. § 25.2518-2(d)(1). The estate argues that this regulation sets up two distinct ways that the disclaimer can be "unqualified": by a legatee's explicitly or implicitly accepting the interest or its benefits before making the disclaimer, or by his receiving consideration in return for making the disclaimer. Accordingly, since the Commissioner has not argued that the disclaimants accepted the benefits of their legacies prior to executing the disclaimers, the only issue is whether the disclaimants received consideration for making the disclaimers.

The Estate further argues that the Tax Court invalidated the disclaimers based on evidence of the disclaimants' motive or expectation and not based upon evidence that the disclaimants received valid consideration for executing the disclaimers. Belief that one will be the beneficiary of future gifts by Monroe or be remembered in Monroe's will is insufficient to establish consideration in the absence of some actual promise or agreement to provide such future benefits. In support, the estate cites *Philpot*

*v. Gruninger,* 81 U.S. (14 Wall.) 570, 577, 20 L.Ed. 743 (1872), where the Supreme Court observed:

> There is a clear distinction sometimes between the motive that may induce to enter into a contract and the consideration of a contract. Nothing is consideration that is not regarded as such by both parties ... an expectation of results often leads to the formation of a contract, but neither the expectation nor the result is the [consideration].

In addition, the estate points to several private letter rulings that have approved disclaimers under § 2518 where the disclaimants clearly expected that executing disclaimers would benefit them in the long run. *See* LTR 9427030 (July 8, 1994). In LTR 9427030, children and grandchildren of the decedent proposed to disclaim their interest in an inter vivos trust, their residuary interest in the decedent's will, and their rights to take under Oklahoma's intestate succession laws. The decedent's surviving spouse also proposed to disclaim her right to take under the decedent's will and the inter vivos trust, but not her right to take by intestate succession. After the disclaimers were made, the surviving spouse would take the entire estate through intestate succession. The surviving spouse also proposed to execute an inter vivos trust providing for essentially the same dispositions at her death as were provided in the trust established by the decedent. The I.R.S. concluded that the disclaimers met the requirements of § 2518(b):

> You represent that there is no agreement, express or implied, between the spouse and the children or grandchildren (or their guardians) with respect to the creation of the trust or will to be executed by the spouse and the proposed disclaimers to be made by the children and grandchildren. You also represent that the disclaimers are being made with the intent on the part of the various parties to save Oklahoma estate tax.

11

Accordingly ... we conclude that neither the potential increase in the family wealth arising from the savings in Oklahoma estate tax through use of the disclaimers described above, nor the surviving spouse's execution of the proposed inter vivos trust, pour-over will, or durable general power of attorney over property, will constitute an acceptance of consideration under s 2518(b)(3) by the children or grandchildren in return for their making the proposed disclaimers.

In another private letter ruling, LTR 9509003 (March 3, 1995), a son, daughter, and three grandchildren executed disclaimers of their respective legacies under decedent's will.  As a result of these disclaimers, the estate claimed an additional $3.2 million as a marital deduction because the property disclaimed passed directly to the decedent's spouse.  The I.R.S. approved the disclaimers:

[I]t is represented that there is no express or implied agreement between the Spouse, Son, Daughter, and three grandchildren regarding the ultimate disposition of the disclaimed property.  In the absence of an underlying agreement, any expectancy Son, Daughter, and the three grandchildren may have in ultimately inheriting an enhanced estate from either a parent or a grandparent is purely speculative.  Accordingly, we conclude that although the five disclaimants have acted in concert in making the disclaimers in order to reduce the estate tax liability of the Decedent's estate, such action does not constitute the acceptance of any consideration in return for the making of a disclaimer within the meaning of s 25.2518-2(d)(1).[3]

The estate also cites cases evaluating the meaning of gifts under I.R.C. § 170.  In *Estate of Wardwell v. Commissioner,* 301 F.2d 632 (8th Cir.1962), the appeals court reversed a Tax Court decision denying a charitable gift deduction to an invalid who made a substantial contribution to a nursing home the day before she was

---

[3]*See also* LTR 8701001 (Aug. 29, 1986) (substantial estate tax savings resulting from disclaimers by minor grandchildren, increasing the amount likely to be inherited by disclaimants, did not amount to receipt of consideration in return for disclaimers; expectancy of inheritance is purely speculative).

granted admission. The Tax Court concluded that the timing of the payment the day before her admission led to an inference that her donation was made with an expectation of benefit that disqualified it as a charitable deduction. *Id.* at 637. The court noted that

> Motivation and expectation do not destroy the reality and genuineness of a bona fide transaction. Nor is a contribution or gift, absolute in form when made, invalidated by reason of conditions arising subsequent to the making thereof.

*Id.* at 636 (citations omitted). The Court relied on the unambiguous written subscription agreement to conclude that her donation did not give her a "legally enforceable right to room occupancy." *Id.* at 637-38. *See also Dowell v. U.S.,* 553 F.2d 1233, 1238-39 (10th Cir.1977) (affirming Tax Court conclusion that donation to nursing home qualified as tax-deductible gift despite the Commissioner's argument that the donation entitled the donor to "substantial residency benefits").

Finally, the estate faults the Tax Court for generalizing about the existence of implicit agreements between Monroe and the legatees rather than determining if each individual had executed an "irrevocable and unqualified" disclaimer without accepting any consideration in return. By its terms, the estate contends, § 2518(b) requires a reviewing court to evaluate each disclaimer individually.

In response, the Commissioner rejects the estate's view of the applicable regulations, arguing that the statute is broader than the regulations. Even if the disclaimants did not receive what amounted to legal consideration in return for disclaiming, under the plain meaning of the statute, the disclaimers were not

13

"irrevocable and unqualified":  they were not irrevocable because the legatees received the substance of the bequests through Monroe's "gifts" and they were not unqualified because the legatees were induced or coerced into executing the disclaimers.

The Commissioner accuses the estate of reading out the "irrevocable and unqualified" requirement of the statute by focusing on the regulations which interpret § 2518(b)(3).  The Commissioner does not attempt to define an "irrevocable and unqualified" disclaimer.  However, the Commissioner contends that a disclaimant's expectation that falls short of actual consideration may nonetheless invalidate a disclaimer as not being "unqualified" within the meaning of § 2518(b).

The Commissioner also urges that, although not relied on by the Tax Court, the step-transaction and substance-over-form doctrines support the Tax Court's interpretation of the events. *See Minnesota Tea Co. v. Helvering,* 302 U.S. 609, 613, 58 S.Ct. 393, 394-95, 82 L.Ed. 474 (1938); *Kanawha Gas & Utilities Co. v. Commissioner,* 214 F.2d 685, 691 (5th Cir.1954).  The Commissioner views this as one grand scheme to avoid paying taxes that were owed under Louise Monroe's will.

Furthermore, the Commissioner counsels against reliance on its private letter rulings as precedent.  *See Transco Exploration Co. v. Commissioner,* 949 F.2d 837, 840 (5th Cir.1992).  The Commissioner also argues that the rulings relied on by the estate can be distinguished.  First, each ruling presumed there was no express or implied agreement that anything would be given to the

14

legatees in return for executing the disclaimer, whereas the Tax Court found an implicit agreement between Monroe and 28 of the 29 legatees. Second, the legatees' receipt of essentially the same amount as their bequest within a few weeks of the disclaimers further distinguishes this case from the favorable letter rulings.

The Commissioner also distinguishes the gift cases under I.R.C. § 170, arguing that the section itself embodies a consideration requirement.

Finally, the Commissioner defends the Tax Court's global treatment of the disclaimers, because the decision to invalidate the disclaimers rested less on the legatee's motivations than on the alleged representation that Monroe would "take care of" the legatees if they disclaimed and on Monroe's making gifts so soon after the disclaimers were executed.

IV. *DISCUSSION*

The Tax Court's findings of fact are reviewed under the clearly erroneous standard and its conclusions of law are reviewed de novo. *See Houston Oil & Minerals Corp. v. Commissioner of Internal Revenue,* 922 F.2d 283, 285 (5th Cir.1991). The clearly erroneous standard does not apply, however, when the Tax Court's fact findings are predicated on an incorrect legal standard. *See Houston Oil & Minerals Corp. v. Commissioner of Internal Revenue,* 922 F.2d 283, 285 (5th Cir.1991).

If the disclaimers in this case fail to meet the requirements of § 2518, it is either because they were not "irrevocable and unqualified," or because the disclaimants had "accepted the

15

interest or any of its benefits."  The Treasury regulations further explain that acceptance of the interest within the meaning of § 2518(b)(3) includes not only explicit or implied acceptance of the interest or any of its benefits, but also the receipt of consideration in return for executing the disclaimer.  *See* Treas. Reg. § 25.2518-1(d)(1).

3 Unqualified means "not modified by reservations or restrictions."  *Id.* Under the plain meaning of the statute, an "irrevocable and unqualified" disclaimer is a relinquishment of a legal right that is incapable of being retracted or revoked by the disclaimant and is not modified by reservations or restrictions that limit its enforceability.  None of the written disclaimers challenged by the Commissioner can be attacked as being subject to revocation or subject to some condition:  the documents executed by the disclaimants are irrevocable and unqualified on their face.

Monroe's gifts, given after the disclaimants renounced their bequests, do not change the irrevocability of the disclaimers: once executed, the disclaimers were effective to give up the legatees' rights to their respective bequests from Louise Monroe's estate.  The Commissioner, unlike the Tax Court, seems to be implying that the legatees actually revoked their disclaimers by accepting the gifts from Monroe.  But even if the disclaimants subsequently received and accepted a payment from Monroe, the Commissioner has not demonstrated how such acceptance affects the enforceability of the previously executed disclaimer.  The disclaimants still had no right to such a payment from the estate

or from Monroe.  Thus, the disclaimers were not revoked.

But irrevocability is a side issue.  The real bone of contention is whether the disclaimers were "unqualified", and whether unqualified has some meaning beyond the possibilities carefully delineated in the applicable Treasury Regulations.  None of the written disclaimers articulates any kind of disabling qualification, of course.  Nevertheless, the Tax Court and the Commissioner assert that because all but one of the disclaimants "expected," because they were "induced" or "coerced" by Monroe, that they would eventually receive their bequests in the form of a gift or legacy, their renunciations were "qualified" to the extent of the expectation.  As the Tax Court later put it, a disclaimer is not "unqualified" if it rests on an "implied promise" that the disclaimant will be better off executing the disclaimer than not doing so.  Further, according to the Tax Court, the "implied promise" may exist even though the disclaimants did not negotiate or bargain with Monroe for later recompense.

We disagree with this interpretation of "unqualified."  It is inconsistent with a holistic reading of section 2518(b), contrary to the governing Treasury Regulations and the Service's letter rulings, and intolerably, unnecessarily vague.

Section 2518(b) describes a covered disclaimer as one which is "unqualified ... but only if [the disclaimant] ... has not accepted the interest or any of its benefits."  A "qualification," therefore, would seem to depend on the tangible receipt of property, *i.e.,* the "interest or any of its benefits."  That is

17

also the most sensible understanding of an unqualified disclaimer. One who disclaims an interest in property must do so without getting something in exchange; and since property has been given up, it follows that a "qualified disclaimer" would be one in which the renunciation is not complete because property has been kept or received in return.

The Commissioner and Tax Court would eliminate this statutory symmetry by holding that a disclaimer of property is "qualified" even though something less than property, *e.g.* an "expectation" or "implied promise", is received in return. While their reading would enhance the government's ability to disqualify disclaimers, it also rests on an incomprehensible subjective standard. How likely is it, in tax terms, that people would disclaim "a bird in the hand" purely altruistically? Yet the clear inference to be drawn from the Tax Court's approach to this case is that a "qualified disclaimer" demands no less than disinterest in the "property or its benefits." The court voided all of the disclaimers here except that of Ms. Tebo, who acted solely for personal reasons in executing a disclaimer. On the contrary, as the Service's letter rulings indicate, a primary purpose of the law authorizing qualified disclaimers is to facilitate post-mortem estate tax planning and to increase family wealth on the "expectation" that there will thus remain more wealth to pass on to disclaimants in the future. Consequently, if the Tax Court's subjective interpretation of "unqualified" disclaimer is accepted, it undermines the very purpose for which the provision was enacted.

It also ensures litigation in virtually every disclaimer situation, because it can be assumed that heirs and legatees rarely execute disclaimers for tax purposes without having had some "expectations" or "inducements" based on conversations with advisers on the prospective benefits of such a course of action.

Not only does the statutory language conflict with the Tax Court's interpretation of an "unqualified disclaimer," but the Treasury Regulations are also incompatible with the "expectation" or "implied promise" theory. This is not to say that we are required to enforce Treasury Regulations instead of the statute, but rather, that the regulations mirror the correct understanding of the statute better than the Commissioner's and Tax Court's present positions. The regulations set forth two situations in which a disclaimer expresses a mere qualified refusal to accept an interest in property: when the disclaimant accepts, expressly or impliedly, the interest or any of its benefits; and when the disclaimant receives "consideration" in return for executing the disclaimer. Treas. Reg. § 25.2518-2(d)(1). Consistent with our interpretation, a disclaimant cannot purport to disclaim, while taking actual advantage of the property "or any of its benefits." Further, the disclaimant cannot accept "benefits" from the property by receiving consideration in exchange for the disclaimer. The juxtaposition in the regulation between the "implied" acceptance of the interest or any of its benefits and the "consideration" that must be received in exchange for a disclaimer is not accidental. One may impliedly accept the benefits of property, for instance by

19

pledging it as security for a loan, and therefore act inconsistently when making an alleged disclaimer. On the other hand, only by receiving "consideration" in the classic sense does one receive "property" or any of its benefits in exchange for executing the disclaimer. We thus agree with the estate that to have accepted the benefits of a disclaimed interest, the disclaimant must have received actual consideration in return for renouncing his legacy.

A disclaimant's mere expectation of a future benefit in return for executing a disclaimer will not render it "unqualified." "Consideration", used deliberately in the regulations, is a term of art. *See Philpot v. Gruninger,* 81 U.S. (14 Wall.) 570, 577, 20 L.Ed. 743 (1872); *Fire Ins. Ass'n v. Wickham,* 141 U.S. 564, 579, 12 S.Ct. 84, 88, 35 L.Ed. 860 (1891) (to constitute consideration, promise "must have been offered by one party, and accepted by the other, as one element of the contract"). This is the way the regulations are written, and it is consistent with the Commissioner's letter rulings, which are properly cited as evidence of how the Commissioner has interpreted the law in the past. *See Transco Exploration Co.,* 949 F.2d at 840. In each of the three rulings cited above, the obvious expectation that the disclaimant would be better off in the long-run by renouncing his interest in favor of the decedent's spouse did not violate the bar against acceptance of the disclaimed interest or its benefits. *See* LTR 8701001, LTR 9427030, and LTR 9509003, *supra.* In one letter ruling, the surviving spouse proposed to set up an inter vivos

trust calling for the same distributions at her death as were provided in the trust established by the decedent. *See* LTR 9427030. In each case, the Commissioner cited the lack of an agreement between the parties as to what the disclaimants were to receive in the future. The Commissioner implicitly recognized the distinction between the expectation that renouncing is in the disclaimant's best interest and an expectation that rises to the level of consideration. The charitable contribution cases also recognize this distinction. *See, e.g., Wardwell,* 301 F.2d at 638 ("Motivation and personal expectation do not destroy the reality and genuineness of a given transaction, even in tax cases"). Thus, the question for each disclaimer is whether the decision to disclaim was part of mutually-bargained-for consideration or a mere unenforceable hope of future benefit, whether that unenforceable hope springs from family ties, long-term friendship or employment, or a generalized fear that benefits will be withheld in the future absent execution of the disclaimer.

Accordingly, we also agree with the estate that the Tax Court was required to evaluate each disclaimer under the requirements of § 2518. The statutory requirements are applicable to each interest disclaimed. The estate submitted documentary evidence supporting all 29 disclaimers and testimony regarding all but two. Although the Tax Court singled out Helene Tebo, finding that she disclaimed her bequest for personal reasons, its opinion lumps the remaining 28 disclaimers together. As the Commissioner argues, the Tax Court may have focused on alleged inducement and/or coercion of the

21

disclaimants by Robert and Edgar Monroe, rather than on each legatee's motivation for disclaiming. But the correct standard requires a finding whether there was actual bargained-for consideration for the disclaimers.

The rehearsed presentation by Robert Monroe does not in itself support a finding that there was consideration. He explained the estate tax problems created by the decedent's will and how executing the disclaimers would affect the distribution of property. He informed the legatees that they were giving up a right and that he could not promise them anything in return for that. The only potentially questionable part of the presentation was the reference to his uncle's generosity. The Tax Court found that the intent of this statement was

> to inform the disclaimants that the probability that they would receive something from Monroe in the future was good. Conversely, if the legatees refused to disclaim, they were unlikely to receive anything from Monroe subsequently, because their refusal would be against Monroe's wishes.

Even assuming that the Tax Court correctly ascertained Robert Monroe's intention, his statements merely reminding the disclaimants of Monroe's history of generosity, without demonstrating that the individual legatee did or could reasonably be expected to interpret such a reminder as a promise, do not invalidate the disclaimers. It is only where the evidence indicates that Robert or Edgar Monroe went further than this rehearsed presentation, or that a particular legatee interpreted

22

this as a promise,[4] that the Tax Court's findings might be supported. Furthermore, even if the record shows that Robert or Edgar Monroe went too far in their representations to a specific legatee, that does not support a generalization applicable to other disclaimants.

Turning to an evaluation of the record relevant to each disclaimer, we conclude that for the majority of the disclaimants, the evidence as a matter of law does not support a finding of any agreement that would amount to consideration for the execution of the disclaimers. The duty to defer to the Tax Court's findings of fact applies only insofar as the Tax Court correctly applied the law, which it did not do here. And in any event, with regard to most of the disclaimers, there is no specific evidence other than that which only supports a finding that the disclaimers were made without consideration.

In addition to testimony indicating that they were made no promises and that they understood that they were giving up any right to claim something from Louise Monroe's estate, many legatees testified to some personal reason inconsistent with improper inducement or coercion by Monroe. These are the disclaimers executed by Clarence Landry,[5] groundskeeper for 14 years ($14,350);

---

[4]The Tax Court repeatedly implies that "threats" could create "consideration" for a renunciation of a legacy. We leave that question for another day, although the idea appears incompatible with a focus on consideration for a disclaimer. There is no evidence that any legatee was coerced into executing a disclaimer.

[5]He testified that "[Edgar Monroe] didn't make any promises. I didn't know whether I was going to get anything or not. Can't

23

John McDonald,[6] butler/chauffeur for 12 years ($8,975); Marie Louise Conway,[7] household employee for 19 years ($9,430); Carol Monroe,[8] ex-wife of Robert Monroe ($5,000); Edward Jameson,[9] chauffeur for 27 summers in Newport, Rhode Island ($5,000);

---

say, you particularly what I was going to get. I could end up with nothing, because I signed for nothing."

[6]Although McDonald, who was 84 at the time he testified at trial, said that he did not really understand what the renunciation said, he also testified that he discussed it with his niece, he understood that he was giving up the money given to him by Louise Monroe, he did so voluntarily, he had no recollection of anyone telling him he would get something for disclaiming his interest, and he could not remember specifically why he signed the renunciation.

[7]Conway showed the disclaimer to her son, who explained to her that she would be giving up her right to inherit under Louise Monroe's will. She testified that "I have faith in Mr. Monroe if I was entitled to whatever it was, I am sure I would get it," and that "when you work for a person as long as I have worked—you know, I have worked for them, you just have faith in people, and I had faith in [Edgar Monroe]." Under questioning from the Court, Conway testified that she did not know what would happen if she did not sign the disclaimer: "I just didn't give that a thought. I really didn't."

[8]The Monroes were so generous in putting her children through college that Carol Monroe was "deeply grateful" and renounced her bequest as "a way of paying back a debt that I felt." After executing the disclaimer, she put the matter "totally out of my mind after that, to the point that I didn't remember how much had, you know, been given to me."

[9]When the Monroes sold their Newport residence, they created a trust fund to take care of Jameson. Jameson had passed away as of the trial, and Robert Monroe testified that he made no bargains with Jameson in return for the disclaimer Jameson executed.

24

Dorothy Fujii,[10] the Monroes' niece ($5,000); Beryl Fransen,[11] Louise Monroe's cousin ($75,000); Anthony Farris,[12] a gardener at the Monroe's Mississippi home ($5,000); Miriam Walmsley,[13] daughter of the Monroes' closest friends in New Orleans ($5,000); Joseph P. Monroe,[14] Robert Monroe's brother ($5,000); Joy Monroe,[15] Joseph P.

---

[10]Fujii had died before the trial. Robert Monroe testified that he telephoned her in Japan to discuss the disclaimer. Fujii did not commit to making the disclaimer right away, but discussed the issue with her sister, Marilyn Monroe Wolf, before deciding to renounce. Robert Monroe testified that he made no promises of any future benefit in return for her disclaimer.

[11]Fransen had died before the trial. Robert Monroe testified that he made no promises of anything in return to Fransen for signing the disclaimer. James Burke, the attorney who served as a notary for Fransen's disclaimer, testified that Fransen signed the disclaimer voluntarily and that he observed no explicit or implicit promise on the part of Robert Monroe.

[12]Mr. Farris was unavailable to testify at trial. He was one of the four Mississippi household employees approached by Edgar Monroe about the disclaimers. Robert Monroe, who was in the house when Edgar Monroe talked to each of the employees, testified that he did not observe any promises or threats being made to Farris to get him to disclaim.

[13]Robert Monroe testified that he approached Walmsley about the disclaimer and that she voluntarily signed it without any promises of future benefits.

[14]Joseph P. Monroe was ill during the trial, but the parties stipulated that he would testify in part that Robert Monroe "made it clear to me that I was under no obligation to renounce. I decided to execute a renunciation because I hoped that doing so would cause my Uncle Edgar to view me in a favorable light in the future. I was never promised anything for my renunciation nor was I given any commitment that any future gifts would be made by J. Edgar Monroe. As J. Edgar Monroe had been very generous to me and my family in the past, I simply felt that executing the renunciation would be in my best long-term interest."

[15]The parties stipulated that Joy Monroe would testify that she executed the renunciation because her husband "advised me that he was going to renounce his inheritance because he felt that it would be in our best long-term interest. I chose to renounce the inheritance because my husband asked me to."

25

Monroe's wife ($5,000); Beatrice de la Vergne,[16] distant cousin ($5,000); Robert Monroe ($5,000); Marjorie Monroe Colomb ($10,000),[17] and Teche Bennett ($5,000).[18]

There was no evidence about the disclaimer in the amount of $5,000 executed by Airline Animal Hospital other than the renunciation document itself. From the four corners of the document, there is no reason to doubt that it was executed voluntarily and without consideration.

The remaining disclaimers involve at least some evidence that Robert or Edgar Monroe may have gone further in their representations than Robert Monroe testified was his rehearsed presentation. Beginning with the largest disclaimer, that of the Hayward family, including Kathleen Hayward's renunciation of her

---

[16]De la Vergne testified that "[Robert Monroe] said that there was some problems with the income tax, and it would be better for the estate if that was renounced. And since I certainly didn't want to do anything to hurt people who had been kind and nice to me, I said I would be glad to." Robert Monroe did remind her that Monroe was a generous man.

[17]Marjorie Monroe Colomb, Monroe's niece, testified that she renounced because Monroe "has been good to me too many years, and he has given me just so many things over the years. He has been very kind, so what was this one thing?" She also testified that Monroe had previously given her gifts of $10,000 "almost every year; not quite." Monroe had also bankrolled her husband's failed business. Colomb testified that she had not been promised anything in return for her disclaimer.

[18]Bennett testified: "My uncle Edgar has given so much to us that if he would have asked me to give anything up, I would have. I just had that kind of respect for him." She talked it over with a friend who was a lawyer: "And he had asked me if I understood that I was not going—you know, that I am giving this money up, was I crazy. And I told him, no, I was asked to do it, and I would. And he says, Well, did they promise you, and I told him, no, they couldn't promise me, and that I was doing this because I wanted to."

interest in the income from a $500,000 bond and her three children's renunciation[19] of their interest in the trust principal, the Tax Court cited her testimony on cross-examination that although Monroe "didn't state that" she would get her disclaimed inheritance either during Monroe's lifetime or in his will, she "sort of certainly assumed that" she would. Viewed in context, however, this testimony furnishes no support for a finding of actual consideration for executing disclaimers. First, each of her adult children executed disclaimers of their interests in the trust principal after being asked to do so by their mother. At a minimum, their disclaimers, which represented the bulk of the $535,781 present value of the bequest, warrants analysis separate from that of Kathleen Hayward. It is apparent that an adult's decision to renounce a bequest at the simple request of his mother, without any indication that he was promised anything in return for the disclaimer, does not take a disclaimer outside the strictures of § 2518(b).

Second, turning to Hayward's statements, we are convinced that it would be error to conclude that her assumption that Monroe would honor her aunt's request in his will made her disclaimer in return for an implicit promise from Monroe. Hayward did not testify that Monroe explicitly or implicitly created this expectation. In fact she testified that Monroe did not say that he would give her

---

[19]Hayward's daughters, Cherie, Shannon, and Susanne Champagne, also were the beneficiaries of cash bequests of $5,000 each. It is undisputed that they disclaimed these bequests for the same reasons that they disclaimed their interests in the trust.

anything, that she renounced "[b]ecause my uncle was upset, and he is very important to me, and I didn't like to see him like that," that she understood, upon the advice of an attorney, that Monroe was under no obligation to give her anything, and that although she "probably would have been hurt" had Monroe not remembered her in his will, it would not have made a difference to her if she had not received the money because "[she didn't] really need it."

Elizabeth Monroe Richardson, Monroe's niece with the daughter who was ill with cancer, renounced her $5,000 bequest because "you don't go against Edgar if you ever want anything from him." This fear that she and her daughter might not be the beneficiaries of future support from Edgar if the bequest was not disclaimed apparently arose from Richardson's prior dealings with Monroe, because she did not testify that anything said to her in the discussions about the disclaimer indicated that Robert or Edgar Monroe explicitly or implicitly threatened her with a loss of future support. Although Richardson may have felt that irritating Edgar Monroe might jeopardize his future support, this does not invalidate the disclaimer any more than a generalized expectation that Monroe would be generous in the future if the bequest was renounced. Absent some promise or agreement specifically related to renouncing the bequest, an otherwise valid disclaimer should not be invalidated.

Marilyn Monroe Wolf, a niece of the Monroes, testified that Robert Monroe told her that because of estate taxes, she would only receive $1,800 of the $5,000 left to her. However "it would go to

28

my uncle tax-free if I did renounce, and that I would not be promised anything in return for the renunciation; it was up to me if I wanted to do that or not." She decided to renounce because the amount she would receive "was not a significant amount to me, and since [Edgar Monroe] was upset about it, I wanted to keep him happy, so I agreed to do it." Wolf wanted to keep Monroe happy because "I had an expectation that I or my sons would be in his will, and I didn't want to do anything to interfere with that." However, she testified that she was not promised anything or "led to believe she would get anything" in return for renouncing the bequest. Wolf may have believed that she had a greater likelihood of keeping her family in Monroe's will by executing the disclaimer, but her expectation was not created by any promise or agreement made by Robert Monroe. Accordingly, her disclaimer, like that of Betsy Richardson, does not fall outside the scope of § 2518(b).

Finally, six of the disclaimers present fact issues which must be reconsidered by the Tax Court in light of the correct standard.

Lawrence Lee's testimony, excerpted earlier, indicates that although he felt that Monroe made no promises or guarantees, Monroe did say that "he would take care of it" or "take care of us [the household employees]." Lee had worked for the Monroes for 40 years as of Louise Monroe's death and renounced a bequest of $50,000 plus his annual salary of $10,806. Lee was highly likely to trust and rely on any implicit representation by Monroe. This is a close case. Although Monroe made no specific reference to a gift or

subsequent bequest, the circumstances of the representation require further analysis based on the proper legal standard.

Judith Bazer, Monroe's great, great niece, who renounced a $5,000 bequest, executed an affidavit at the request of I.R.S. agents. In the affidavit, she states that Robert Monroe told her that "if we would give the money back by executing the disclaimer, we would save on the taxes and my uncle (J. Edgar Monroe) would see to it that we get the full amount of our inheritance." Judith Bazer also stated in the affidavit that when Monroe later wrote her the $5,000 check, "it was accepted as a gift, although I knew the true purpose of the check." Judith Bazer also testified at trial that Robert Monroe only told her that "[y]our uncle has taken care of you, and he always will."

Rachel Bazer, who disclaimed a $5,000 bequest, was present when Robert Monroe spoke to her sister, Judith Bazer, about renouncing.

Shane Bazer, great, great nephew of the Monroes, testified that he was not promised anything in return for his disclaimer of a $5,000 bequest. However, the Commissioner presented testimony from I.R.S. agent Raymond Gregson that Shane Bazer had told Gregson in a prior interview that Robert Monroe said that Shane had a better chance of receiving the full amount of the bequest if he renounced.

Vivian Simmons, the Monroes' maid for four years, signed an affidavit stating that Robert Monroe told her that "if I would sign the disclaimer, J. Edgar Monroe would see to it that I would get

30

the full amount of money willed to me from the estate."

Donatilda Harris, the Monroes' cook for over 50 years, testified that Robert Monroe asked her to renounce, stating that "he would take care of us." On cross-examination, Harris admitted telling I.R.S. agents on a prior occasion that she was told at the time of her disclaimer that she "would receive the money that you were disclaiming from J. Edgar Monroe."

*Step-transaction/Substance-over-form*

Finally, we disagree with the Commissioner's contention that the Tax Court's decision should be affirmed on substance-over-form or step-transaction grounds. While the disclaimants, to varying degrees, may have thought they would eventually receive something from Monroe, even the actual amount of their legacy, the evidence shows that most really believed they were, in fact, giving up their legacy under Louise Monroe's will. Several legatees sought outside counsel before making their decision. As long as there was no implicit agreement that they would receive something from Monroe in return for their disclaimers, the fact that the legatees understood they were giving up their rights and actually did, in a manner effective under Louisiana law, give up their rights is sufficient. There is no evidence that any of the legatees who executed disclaimers that we have held to be "qualified disclaimers" under § 2518(b) believed they were receiving their inheritance under Louise Monroe's will when they received Edgar Monroe's gifts. Accordingly, Monroe's subsequent gifts do not change the legitimacy or legal effect of the legatee's renunciations.

31

V. *NEGLIGENCE PENALTY*

Although the Commissioner conceded at trial that the fraud penalty was inapplicable, she nonetheless argued for the imposition of a 20% negligence penalty under I.R.C. § 6662(a). The Tax Court, rejecting the estate's arguments, concluded that the estate could not rely on the accountants' advice because Monroe had failed to disclose material facts. In particular, the Tax Court felt that without being told that Monroe intended to make gifts to the legatees shortly after the disclaimers were executed, the accountants could not properly advise him. Furthermore, the Tax Court concluded that Monroe's honest disagreement related entirely to interpretation of the facts and not of any unclear legal principles.

The Tax Court erred. First, as we have already determined that 23 of the 29 disclaimers were "qualified disclaimers" within § 2518(b), any addition to tax for negligence would be proportionally reduced by the amount of understatement that results when these disclaimers are once again included in the marital deduction.

However, even with regard to the remaining disclaimers that continue to pose factual issues, no negligence penalty should have been or is warranted. Negligence is defined in § 6662(c) as "any failure to make a reasonable attempt to comply with the provisions of this title...." Monroe was advised by Touche Ross that gift giving to the disclaimants was allowed, as long as no promises were made to induce the legatees to renounce. Based on that advice, it

32

was not unreasonable for Monroe, who was 93 years old at the time the disclaimers were made, to decide that the better course was to make any gifts that he wished to make sooner rather than later.[20] Furthermore, the only additional advice that Monroe would have heard had he told his accountants that he decided to make the gifts was that, although it would not change the substance of the transaction, it would make the transactions look more suspicious, and might subject the estate's return to increased I.R.S. scrutiny. Otherwise, the accountants testified that they would not have changed the advice they gave. Thus, a prudent man, as defined by the Tax Court, would have heard from his accountants that although appearances would suffer from gift giving so soon after the disclaimers, the actual legal status of the disclaimers would not change. We doubt that a man in Monroe's position would or should have been concerned about such appearances.

## VI.

For the foregoing reasons, we REVERSE in part and REMAND for reconsideration of the status of the disclaimers executed by the 6 named individuals.

REVERSED and REMANDED.

KING, Circuit Judge, dissenting:

This is a fact-bound case, hard facts that have now made bad

---

[20]Not only was Monroe significantly advanced in years, but he had recently experienced significant health problems. In fact, he was in a coma for a significant period of time while he was in his 80s. Monroe's decision to not delay in making the gifts proved prescient: he died in May 1990, just five months after the gifts were made to the legatees.

law.   In a three-day trial, the Tax Court heard twenty-three witnesses, including seventeen of the twenty-nine disclaimants. The court made findings of fact that the majority cannot hold to be clearly erroneous, although much of the majority opinion amounts to that.   Instead, the majority invokes the rule that we need not defer to fact-findings infected by an incorrect view of the law and goes on to set out what it perceives to be the correct view of the law:   in determining whether a disclaimer is unqualified, "the correct standard requires a finding whether there was actual bargained-for consideration for the disclaimer[ ]."  Majority Op. at 160-61.   Under the rule promulgated by the majority, only "mutually-bargained-for consideration" will serve to disqualify the disclaimer.  *Id.* at 160.  Neither the statute nor the regulations impose such a requirement, and it creates ample possibilities for tax evasion.   Only the naive or the uncounseled will engage in actual bargaining for the consideration to be received in exchange for a disclaimer or, as is the case with the six disclaimants that are the subject of the majority's remand, will admit to it.   I respectfully dissent.

It is useful to summarize what happened here.   J. Edgar Monroe, the decedent's husband, and Robert J. Monroe, his nephew, solicited and obtained disclaimers of specific bequests totaling $892,781 from twenty-nine legatees under Mrs. Monroe's will. Within days of the execution of the disclaimers, each disclaimant received a check from Mr. Monroe for the amount of the disclaimed legacy.   It is apparent, and the Tax Court so found, that the

34

disclaimers and subsequent checks were not isolated events. They were part of a well-intentioned plan to secure to the legatees the amount of their bequests without diminution for the substantial taxes—in many cases, the tax haircut would have been seventy-five to eighty percent of the amount of the bequest—that would otherwise have been chargeable to those bequests.[1] The legatees from whom disclaimers were solicited were those who "had witnessed firsthand and had felt" Mr. Monroe's generosity. In soliciting the disclaimers, Robert Monroe informed the legatees that taxes would substantially reduce the amount of their legacies and that Mr. Monroe was upset by the high taxes. Robert Monroe made a point of reminding the legatees that Mr. Monroe was a generous man.[2] The

---

[1] Provisions in Mrs. Monroe's will, coupled with the applicable tax law, operated effectively to impose the bulk of the estate and generation skipping transfer taxes on the legatees. If the legatees disclaimed, their bequests would fall into the residuary estate, which, under Mrs. Monroe's will, passed to Mr. Monroe. Provided the disclaimers were qualified within the meaning of I.R.C. § 2518(b), Mrs. Monroe's estate could reduce its estate tax burden by claiming the marital deduction for the amount of the bequests and could eliminate entirely the generation skipping transfer tax. Mr. Monroe clearly hoped to spare the legatees the tremendous tax burden they would bear if they took under the will by paying them the full amount of the bequests himself, largely out of the tax savings that inured to the estate, and therefore to Mr. Monroe as the residuary legatee, as a result of redirecting the bequests to the residuary estate.

[2] Neither Mr. Monroe nor Robert Monroe told the accounting firm responsible for the preparation of the estate tax return and for the related estate tax advice that the gifts had been made. The required gift tax return was not filed. The revenue agent who initiated the audit of the estate tax return did not find out about the gifts until April 1991 when, during the course of the audit, he interviewed two of the donees, who told him about the gifts they had received. The agent testified that he scheduled the estate for audit because he thought it peculiar that employees of the Monroes who were earning less than $10,000 a year had renounced bequests of $50,000 each, plus one year's salary. Ironically, three of those

35

Tax Court found that:

> The disclaimants may not have explicitly negotiated with or bargained with Monroe or the nephew for consideration in return for executing their disclaimers. Each of the disclaimants other than Tebo, however, was induced or, in some instances, coerced, into executing a disclaimer. Under these circumstances, the consideration for their disclaimers was the implied promise that they would be better off if they did what Monroe wanted them to do than if they refused to do so. Their disclaimers thus were not "unqualified" as required by section 2518.

> Tebo is an exception because we are persuaded by her testimony that she voluntarily and without expectation of anything in return renounced her legacy for personal reasons....

> In addition, petitioner has failed to persuade us that Monroe's cash gifts to the 29 disclaimants were merely part of a pattern of generosity that Monroe had engaged in throughout his life. These "gifts" were all cash payments of specific and substantial amounts made to the disclaimants shortly after they executed disclaimers. The inference drawn from this targeted gift-giving is that Monroe made them "in return" for the disclaimants' renouncing their bequests and not from a "detached and disinterested generosity." ... Even if Monroe had no legal obligation to compensate the disclaimants, they anticipated, and received, payments from him that left them in the same economic position as if they had accepted the legacies in the first place.

The majority tells us that consideration consisting of a promise, the existence of which is fairly implied or inferred from what is actually said and done, of a gift or bequest in the full amount of the bequest disclaimed is not enough to disqualify a disclaimer. Instead, the majority requires explicitly negotiated or bargained-for consideration, presumably of the sort required to support a contract. The consideration requirement that the

employees testified that Mr. Monroe or Robert Monroe had told them that Mr. Monroe "would take care of it" or "see to it that [they] would get the full amount of money willed to [them] from the estate" and are subjects of the majority's remand.

36

majority imposes on disqualification of disclaimers is actually more rigid than the consideration requirement in contract formation. It is hornbook law that an implied promise constitutes sufficient consideration to form a contract. *See* ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 144 (1963) ("If a promisor bargains for another promise in return and gets it, he is bound. It makes no difference that the return promise is implied from conduct or from language that is not in the form of express promissory words. That is, it makes no difference with respect to the question of sufficiency of consideration."). Yet the majority holds that an implied promise of remuneration such as the one found by the Tax Court in this case is insufficient to disqualify a disclaimer. As if that were not enough, the majority also tells us that, because disclaimer entails relinquishment of property, a disqualification "would seem to depend on the tangible receipt of property," whatever that means. Majority Op. at 159.

To summarize, the majority's conception of a disqualifying disclaimer possesses three, perhaps four, distinguishing characteristics. First, disqualification of a disclaimer requires the existence of explicit negotiations or bargaining. Second, the disclaimant must receive property, as distinguished from a promise of property, in exchange for the disclaimer. Third, the property received must consist of " "consideration' in the classic sense." Majority Op. at 160. Fourth, because a check from Mr. Monroe in the full amount of the disclaimed bequest received a few days after the disclaimer would seem to constitute the kind of tangible

37

property consideration for the disclaimer that would satisfy the second and third facets of the majority's rule but somehow does not, the majority's characterization of disqualifying disclaimers may also require that the disclaimant receive the tangible property before the disclaimer.  The estate argues for this position, and the majority arguably accepts it.  All of these requirements result from an overly restrictive and unwarranted reading of the statute.

Section 2518 of the Internal Revenue Code defines an "unqualified disclaimer" as "an irrevocable and unqualified refusal by a person to accept an interest in property but only if ... such person has not accepted the interest or any of its benefits." I.R.C. § 2518(b).  The two statutory rationales for the Tax Court's decision represent a fair reading of the statute.  First, giving up the bequest "in return for" a gift is akin to accepting the benefits of the bequest.[3]  Second, a refusal to accept a bequest from Mrs. Monroe "in return for" a gift from Mr. Monroe is not an unqualified refusal.  Contrary to the reading adopted by the majority, the statute makes no mention of bargaining, tangible property, consideration or an enforceable obligation, and there is no warrant in the statute for compelling the Commissioner to litigate over these matters when challenging a disqualification.

The majority supports its reading of the statute by misreading

---

[3]Treas. Reg. § 25.2518(d)(1) tells us that "[a]cceptance is manifested by an affirmative act which is consistent with the ownership of the interest in property."  Exchanging a bequest from Mrs. Monroe for a gift from Mr. Monroe can fairly be said to constitute an act that is consistent with ownership of the bequest.

Treas. Reg. § 25.2518-1(d)(1) to require that a disclaimant receive consideration in exchange for the disclaimer. As the Commissioner points out, the regulation describes several circumstances in which a disclaimant is deemed to have accepted the benefits of a legacy, the last among them (or, in the words of the regulation, "in addition" to the other circumstances listed in the regulation) being where the disclaimant accepts consideration in return for the disclaimer. The regulation cannot fairly be read to require consideration before disqualifying a disclaimer.

The majority likens the promise of gift or bequest implied from Mr. Monroe's words and actions to a "mere expectation" or unenforceable hope of future benefit and rejects the implied promise along with the mere expectation. As the private letter rulings make clear, in the absence of an express or implied agreement, the mere expectation or hope that a disclaimant may one day benefit from the disclaimed property (generally in the form of an inheritance) is too speculative to form the basis for disqualifying a disclaimer. But the crux of the inquiry is whether there is an express or implied agreement. Based on all of the evidence before it, including evidence of the words and deeds of Mr. Monroe and Robert Monroe, as well as the legatees' agreement to disclaim, the Tax Court reasonably deduced that an implied agreement existed between Mr. Monroe and the legatees. The Tax Court cannot fairly be read to have based its decision on a "mere expectation" or hope of future benefit on the part of the legatees.

Finally, the majority opinion contains a great deal of

39

fact-finding, and the majority fails to acknowledge it as such. This case requires, first and foremost, credibility determinations about the testimony of Robert Monroe and the disclaimants, determinations properly relegated to the Tax Court. The Tax Court was not required to accept that testimony at face value, nor was it required to go through each piece of testimony and say that the court did not credit it. The Tax Court's opinion makes very clear that the court simply did not credit much of what it heard. We overstep the bounds of our authority as appellate judges when we go back through an appellate record and make our own credibility assessments about the witnesses' testimony. The majority opinion errs in that respect.

As is apparent from the majority opinion, no law addressing factual scenarios even remotely similar to the facts at issue here exists at the appellate level. The Commissioner accepts the concept of post-mortem tax planning, and until now the rules have been relatively clear. As Robert Monroe testified in the Tax Court, "the person renouncing ... can't receive a benefit for signing a renunciation." As for a subsequent gift or bequest, in Robert's words, "you just couldn't have a promise." The Tax Court found as facts that the disclaimants received a benefit for signing a renunciation, and that just such a promise existed. In order to overturn those fact-findings, the majority has now imported concepts of explicit bargaining, consideration and tangible receipt of property into a statute conspicuously devoid of them. I respectfully dissent.

40